**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-0916 |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division, in Winchester, Virginia.   I have held this position since August 1, 2002.   Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.   In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.   From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.   I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 249 employees who staff a total of ten (10) FBI Headquarters units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage

1

responses to requests for access to FBI records and information pursuant to the FOIA as

amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA

Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13,526; Presidential,

Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and

Congressional directives.   My responsibilities also include the review of FBI information for

classification purposes as mandated by Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29,

2009), and the preparation of declarations in support of Exemption 1 claims under the FOIA.   I

have been designated by the Attorney General of the United States as an original classification

authority, and a declassification authority pursuant to Executive Order 13,526 §§ 1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

## **PLAINTIFF'S FOIA REQUEST**

(3)      By letter dated March 8, 2017, Plaintiff submitted a FOIA request to the FBI.

*See* Exhibit A.

(4)      Plaintiff requested:

[1]     Any and all records of communication between any official, employee, or
representative of the [FBI] and Mr. Christopher Steele, a former British
intelligence officer and the owner of the private firm Orbis Business
Intelligence.

[2]     Any and all records regarding, concerning, or related to the proposed,
planned, or actual payment of any funds to Mr. Steele and/or Orbis
Business Intelligence.

[3]     Any and all records produced in preparation for, during, or pursuant to any

> meetings or telephonic conversations between any official, employee, or representative of the [FBI] and Mr. Christopher Steele and/or any employee or representative of Orbis Business Intelligence.

*Id.* at 1.   Plaintiff specifically requested any responsive records "produced and/or maintained by" the FBI's Assistant Legal Attaché in Italy.   *Id.*   The timeframe for the request was January 1, 2016 to "the present."   *Id.*   Plaintiff further requested a public interest fee waiver.   *Id.* at 2.

(5)   The FBI acknowledged receipt of plaintiff's request in a letter dated April 3, 2017.   The FBI assigned it FOIPA Request No. 1370340-000 and deferred decision on Plaintiff's fee waiver request.   *See* Exhibit B.

(6)   On May 16, 2017, the FBI responded to Plaintiff's FOIA request via a *Glomar* response whereby the FBI did not confirm or deny the existence or non-existence of responsive records.   At that time, the FBI cited as the bases for its *Glomar* response FOIA Exemptions 1, 3, 6, 7(A), 7(C), and 7(E).   *See* Exhibit C.   Upon further review, the FBI is also relying on Exemption 7(D) to support its *Glomar* response.   It is no longer relying on Exemption 7(E).

(7)   Also on May 16, 2017, Plaintiff filed the present lawsuit.

## MEDIA REPORTS ABOUT CHRISTOPHER STEELE

(8)      Eight days before Plaintiff submitted its request, the Washington Post reported

that Christopher Steele, who it described as a "former British spy," was "hired" in 2016 "to work

for a Washington research firm, Fusion GPS, that was providing information to a Democratic

client."   Tom Hamburger & Rosalind S. Helderman, *FBI once planned to pay former British*

*who authored controversial Trump dossier*, WASH. POST, Feb. 28, 2017,

https://www.washingtonpost.com/politics/fbi-once-planned-to-pay-former-british-spy-who-

authored-controversial-trump-dossier/2017/02/28/896ab470-facc-11e6-9845-

576c69081518_story.html.   The Post went on to report that Steele, "while working" for Fusion

GPS, "authored a controversial dossier" that "alleged, among other things, that associates of

Trump colluded with the Kremlin on cyberattacks on Democrats and that the Russians held

compromising material about the Republican nominee."    *Id.*   According to the Post, "Steele's

information was provided by an intermediary to the FBI and U.S. intelligence officials . . . in

July" of 2016, after which "Steele contacted a friend in the FBI to personally explain what he

had found."    *Id.*   The Post reported that Fusion GPS "was due to stop paying Steele as Election

Day approached, but Steele felt his work was not done."    *Id.*   According to the Post, "[i]n

October, anticipating that funding supplied through the original client would dry up, Steele and

the FBI reached a spoken understanding: He would continue his work looking at the Kremlin's

ties to Trump and receive compensation for his efforts."    *Id.* (reporting that Steele "reached an

agreement with the FBI a few weeks before the election for the bureau to pay him to continue his

work").   The Post reported that the agreement fell through, however, and "[u]ltimately, the FBI

did not pay Steele." *Id.*    Finally, the Post reported that the FBI declined to comment on the

story.   *Id*.

(9)    Other media outlets published similar reports.   *See, e.g.,* David Millward, *FBI*

*'reached agreement' to pay Christopher Steele, the former MI6 officer who produced the Donald*

*Trump Russian dossier*, THE TELEGRAPH, Feb. 28, 2017; Jason Silverstein, *FBI planned to pay*

*spy behind Trump-Russia dossier to continue his research*, NEW YORK DAILY NEWS, Mar. 1,

2017 (citing other media sources on the story, including CNN and NBC News).

## THE RUSSIA INVESTIGATION

(10)    On March 20, 2017, then-FBI Director James B. Comey made the following

statement in testimony before the House Permanent Select Committee on Intelligence:

> I have been authorized by the Department of Justice to confirm
> that the FBI, as part of our counterintelligence mission, is
> investigating the Russian government's efforts to interfere in the
> 2016 presidential election, and that includes investigating the
> nature of any links between individuals associated with the Trump
> campaign and the Russian government and whether there was any
> coordination between the campaign and Russia's efforts. As with
> any counterintelligence investigation, this will also include an
> assessment of whether any crimes were committed.

Statement Before the House Permanent Select Committee on Intelligence (Mar. 20, 2017),

*available at* https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-

investigation.   Director Comey further explained that "[b]ecause it is an open, ongoing

investigation and is classified, I cannot say more about what we are doing and whose conduct

we are examining."   *Id.*

(11)    On May 17, 2017, Deputy Attorney General Rod Rosenstein appointed former

FBI Director Robert Mueller to serve as special counsel to oversee the Russia investigation.   *See*

DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017).   This appointment authorizes Special Counsel Mueller to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:   (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."   *Id.*   In addition, "[i]f the Special Counsel believes it necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters."   *Id.*

(12)     The Russia investigation remains ongoing.   However, other than disclosing the investigation's existence neither the FBI, Special Counsel Mueller, nor any representative of the Department of Justice has publicly or officially acknowledged any other details about the investigation, including, for example, its subjects, scope, or focus.

### THE FBI's *GLOMAR* RESPONSE

(13)     The FBI relies on a *Glomar* response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions.   To be credible and effective, the FBI must use a *Glomar* response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request.

If the FBI were to invoke a *Glomar* response only when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist.

(14)     The FBI has determined that merely acknowledging the existence or non-existence of records responsive to Plaintiff's request would trigger harm under FOIA Exemptions 1, 3, 6, 7(A), 7(C), and 7(D), for reasons explained at greater length below.

(15)     Pursuant to Exemptions 1 and 3, the FBI does not release information about its counterintelligence investigations.   Pursuant to Exemption 7(D), it does not release information about confidential sources.   Pursuant to Exemptions 6 and 7(C), the FBI does not release information about the inclusion of names of particular individuals—including informants—in its law enforcement files.   Pursuant to Exemption 7(A), it does not release information that could interfere with law enforcement proceedings.   The FBI also refuses to confirm or deny the existence of responsive records when doing so could provide these types of information.

(16)     The FBI's determination that a *Glomar* response is necessary here flows from the subject matter of Plaintiff's request, the context in which it was made, and the timeframe of the request.

(17)     Plaintiff's request seeks records related to interactions between the FBI and Christopher Steele, who it identifies as "a former British intelligence officer," or Orbis Business Intelligence, which it describes as a "private firm" that he owns.   On its face, therefore, the request would probe the FBI's communications, if any, with a retired foreign intelligence officer, including any plans or agreements to pay him or the company he owns.

(18)     Moreover, Plaintiff's request was made shortly after the Washington Post and other media outlets published reports essentially alleging that the FBI had at one time agreed to pay Christopher Steele to serve as an informant in the ongoing Russia investigation, so that he could continue the research reflected in his alleged "dossier."

(19)     Finally, the timeframe specified in Plaintiff's FOIA request—January 2016 to the present—corresponds to the period of time in which Christopher Steele allegedly undertook his investigation regarding President Trump, and in which the FBI allegedly agreed to make payments to Mr. Steele related to that investigation.

(20)     Although Plaintiff's FOIA request—which seeks "any and all records of communication" between the FBI and Mr. Steele or Orbis, or related to payments from the FBI, or related to meetings or conversations between those parties—could be read to extend beyond the allegations published in the Washington Post and other media outlets, a substantive response to the FOIA request would tend to confirm or refute those reports and could suggest the contours of any relationship, including a paid relationship, between the FBI and a former foreign intelligence officer.   The existence of responsive records would tend to suggest such a relationship and to confirm those recent reports (even though there would remain some possibility that all of the responsive records were entirely unrelated to intelligence activities or the publicly reported allegations), and the nonexistence of any responsive records would tend to refute them.   Because any substantive response to the FOIA request, whether positive or negative, could lead interested parties to deduce additional information about national security investigations and confidential sources and informants, would invade individual privacy

8

interests, and could interfere with pending law enforcement proceedings, the FBI therefore can neither confirm nor deny that responsive records exist.

(21)    The FBI has determined that a *Glomar* response is necessary here for many related reasons.   As discussed above, Plaintiff's FOIA request seeks records the existence or nonexistence of which would tend to confirm or disprove the FBI's relationship with a former intelligence officer who has been reported to be a confidential source in a counterintelligence investigation with potential criminal implications.   The FBI's *Glomar* response here is justified because revealing the existence or non-existence of responsive records:

A.    is classified in the interest of national security, *see* 5 U.S.C. § 552(b)(1);

B.    would risk disclosure of information protected by statute, specifically the National Security Act of 1947, *see id.* § 552(b)(3);

C.    could reasonably be expected to reveal whether or not Mr. Steele and/or Orbis Business Intelligence are or were confidential sources in an FBI investigation, *see id.* § 552(b)(7)(D);

D.    would unwarrantedly invade Christopher Steele's personal privacy, *see id.* §§ 552(b)(6), 7(C); and

E.    could reasonably be expected to interfere with law enforcement proceedings, *see id.* § 552(b)(7)(A).

(22)    Aside from the statements of then-Director Comey discussed above, no relevant official disclosures have been made by the FBI.   Specifically, the FBI has made no statements

9

regarding any involvement Christopher Steele or Orbis Business Intelligence may or may not have had with the FBI or its Russia investigation.

(23)    Newspaper and other media reports relying on unnamed, anonymous, or unofficial sources do not constitute official disclosures on behalf of the FBI, and therefore do not undermine the FBI's *Glomar* response in this matter.   The FBI generally does not confirm or deny the accuracy of reports attributed to unnamed, anonymous, or unofficial sources because any response could reasonably be expected to cause harm to protected law enforcement and/or national security interests.   Confirming such reports would require the disclosure of law enforcement sensitive information about pending investigations, investigative targets or activities, classified information, or other information that would be damaging to law enforcement or national security interests.   Indeed, because some public reports based on unnamed, anonymous, or unofficial sources contain classified information, confirming those reports would perpetuate the improper public dissemination of classified information.   Similarly, the FBI cannot respond to such reports only when they are incorrect because that would, itself, highlight those instances when they are in fact correct.   Former Director Comey spoke about this in his March 20th testimony, when he discussed why the FBI does not confirm or refute unsourced media reports.   *See Full transcript: FBI Director James Comey testifies on Russian interference in 2016 election*, WASH. POST, Mar. 20, 2017 (question and answer exchanges between former Director Comey and Representative Trey Gowdy), https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b1ba0eedd74c.

**EXEMPTION 1**

(24)     Exemption 1 protects records that are: "(A) specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense or foreign

policy and (B) are in fact properly classified pursuant to such Executive order."   5 U.S.C.

§ 552(b)(1).   Executive Order 13,526 currently governs classification.[1]   It provides for the

protection of intelligence activities, sources, and methods.   Executive Order 13,526 § 1.4(c).

(25)     As previously explained, Plaintiff seeks records related to a former British

intelligence officer who reportedly was in discusseions investigated President Trump and then

agreed to serve as a paid informant in the FBI's Russia investigation, from the period of time in

which he is alleged to have done so.   Sources providing information or intelligence in such

investigations are protected from disclosure under Executive Order 13,526.   Thus, the FBI must

refuse to confirm or deny whether or not responsive records exist here.

(26)     Executive Order 13,526, which currently governs the classification of national

security information, establishes four requirements for classification: (1) an original

classification authority classifies the information; (2) the U.S. Government owns, produces, or

---

[1] Executive Order 13,526 § 1.1(a) provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of Executive Order 13,526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

Executive Order 13,526 explicitly authorizes precisely the type of response that the FBI has provided to Plaintiffs in this case.   Specifically, § 3.6(a) provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."

controls the information; (3) the information is within one of eight protected categories listed in

section 1.4 of the Order; and (4) the original classification authority determines that the

unauthorized disclosure of the information reasonably could be expected to result in damage to

the national security, and identifies or describes that damage.   Exec. Order No. 13,526 § 1.1(a),

75 Fed. Reg. 707, 707 (Dec. 29, 2009).

(27)     The categories of information listed in section 1.4 include information that

"pertains to . . . intelligence activities" or "intelligence sources or methods."   *Id.* § 1.4(c).

(28)     Executive Order 13,526 further provides that "[a]n agency may refuse to confirm

or deny the existence or nonexistence of requested records whenever the fact of their existence or

nonexistence is itself classified under this order or its predecessors."   *Id.* § 3.6(a).

(29)     I have confirmed that the existence or nonexistence of records responsive to

Plaintiff's FOIA request is classified, because they would tend to confirm or disprove the FBI's

reliance on a specific confidential informant or investigative agent in a counterintelligence

investigation.

(30)     Any records responsive to Plaintiff's request would necessarily be held by the

FBI, and would therefore be "under the control of the United States Government."   *Id.*

§ 1.1(a)(2).

(31)     The existence or nonexistence of such records "pertains to . . . intelligence

activities" or "intelligence sources or methods."   *Id.* § 1.4(c).   An intelligence activity or

method includes any intelligence action or technique utilized by the FBI against a targeted

individual or organization that has been determined to be of national security interest, and

12

includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.   An intelligence activity or method has two characteristics.   First, the intelligence activity or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.   Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(32)   If the activities alleged in the Washington Post and other media reports actually occurred—*i.e.*, an agreement by the FBI to pay an individual for information, an individual's agreement to provide such information to the FBI, and/or any communications between the FBI and that individual or his business—such information would "pertain[] to . . .   intelligence sources or methods," *id.* § 1.4(c), because it would reveal an intelligence source as well as a method of gathering intelligence.

(33)   Intelligence activities and methods, including sources, must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest—or its specific use—is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness.   Intelligence activities, methods, and sources are valuable only so long as they remain unknown and unsuspected.   Once an intelligence activity, method, or source—or the fact of its use or non-use in a certain situation—is discovered, its continued successful use is seriously jeopardized.   And in the case of intelligence sources,

discovery can result in threats to their lives and safety, as well as that of their families and others close to them.

(34)     The U.S. Government must do more than prevent explicit references to an intelligence activity, method, or source; it must also prevent indirect references to them.   One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.   We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.   Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(35)     Here, acknowledging the existence or non-existence of records responsive to Plaintiff's request could tend to confirm or refute the FBI's reliance on a particular intelligence activity or method, including a specific source or sources.   Such an acknowledgement could suggest non-public information regarding the nature of the FBI's intelligence interests, priorities, activities, and methods—information that is desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission.   Accordingly, to confirm or deny that the FBI possesses records responsive to Plaintiff's request could risk compromising intelligence activities and methods, including sources, and thus would pose at least a serious risk to the national security.

(36)     The determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to

prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

## EXEMPTION 3

(37)     Exemption 3 protects information "specifically exempted from disclosure by statute" where the statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld."   5 U.S.C. § 552(b)(3)(B).   Here, the statute on which the FBI relies is the National Security Act of 1947, as amended, which provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."   50 U.S.C. § 3024(i)(1).

(38)     As relevant to the FBI's assertion of Exemption 3, the National Security Act of 1947 was enacted before the date of enactment of the OPEN FOIA Act of 2009.   On its face, this federal statute leaves no discretion to agencies about withholding from the public information about intelligence sources and methods.   Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute.

(39)     In order to fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.   50 U.S.C. § 3024(i)(1).   The FBI is one of 17 member agencies comprising the IC, and as such must protect intelligence sources and methods.

(40)     As described above, Congress enacted the NSA, as amended by the Intelligence

Reform and Terrorism Prevention Act, to protect the IC's sources and methods of gathering

intelligence.   Disclosure of such information presents the potential for individuals to develop

and implement countermeasures, which would result in the loss of significant intelligence

information relied upon by national policymakers and the IC.   Given that Congress specifically

prohibited the disclosure of information pertaining to intelligence sources and methods used by

the IC as a whole, I have determined that the IC's intelligence sources and methods could be

revealed if the existence or nonexistence of records responsive to Plaintiff's FOIA request was

confirmed.   Thus, the FBI is prohibited from disclosing the information under 50 U.S.C.

§ 3024(i)(1).

(41)     As described above, acknowledging the existence or non-existence of records

responsive to Plaintiff's request would provide information about counterintelligence

investigations and confidential sources and informants.   If the activities alleged in the

Washington Post and other media reports actually occurred—*i.e.*, an agreement by the FBI to

pay an individual for information, an individual's agreement to provide such information to the

FBI, and/or any communications between the FBI and that individual or his business—the

requested information would pertain to "intelligence sources and methods," and must therefore

be "protect[ed] . . . from unauthorized disclosure."   50 U.S.C. § 3024(i)(1).

(42)     Accordingly, the National Security Act, in conjunction with Exemption 3,

provides an additional and independent basis for the FBI's *Glomar* response to Plaintiff's

request.

**EXEMPTION 7**

(43)     Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue, if they exist, were "compiled for law enforcement purposes."   5 U.S.C. § 552(b)(7).   Law enforcement agencies such as the FBI must demonstrate that the records at issue, if any, are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(44)     Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations, and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of the United States.

(45)     As discussed above, the subject matter, context, and timeframe of Plaintiff's FOIA request make it clear that the request concerns records that, if they exited, would be likely to be related to the Russia investigation.   That investigation necessarily relates to federal criminal laws falling within the FBI's law enforcement mission to investigate threats to the security of the United States (including conducting criminal, national security, counterespionage, and/or counterintelligence investigations).   Thus, Exemption 7's threshold inquiry is readily satisfied.

17

**EXEMPTION 7(D)**

(46)     Exemption 7(D) protects records or information compiled for law enforcement

purposes when disclosure "could reasonably be expected to disclose the identity of a confidential

source, including a State, local or foreign agency or authority or any private institution which

furnished information on a confidential basis, and, in the case of a record or information

compiled by a criminal law enforcement authority in the course of a criminal investigation or by

an agency conducting a lawful national security intelligence investigation, information furnished

by a confidential source."   5 U.S.C. § 552(b)(7)(D).

(47)     Whenever a requester seeks records about an individual claimed to be an

informant, the FBI relies on a *Glomar* response because to do otherwise jeopardizes its

confidential sources.   If the FBI substantively responded in those instances when the individual

was not in fact an informant (that is, a confidential source) but refused to confirm whether or not

responsive records exist when the individual was an informant, this would itself reveal which

individuals are informants.   Accordingly, the FBI must rely on a *Glomar* response in any

instance in which a requester seeks records about an alleged informant.

(48)     Generally, a paid informant providing information to the FBI does so under

express assurance of confidentiality.

(49)     Moreover, any informant who provided information to the FBI in the course of a

counterintelligence investigation would reasonably expect the FBI to keep his identity

confidential, because the FBI has a well-known practice of refusing to confirm or deny the

identity of any informant who contributes to such an investigation.   Any such informant would therefore be operating under an implied assurance of confidentiality.

(50)    Finally, both individuals and entities such as businesses can be "confidential sources" entitled to protection under the plain language of Exemption 7(D).

(51)    As discussed above, Plaintiff's request seeks records related to a former British intelligence officer who reportedly agreed to serve as a paid informant in relation to the FBI's Russia investigation, from the period of time in which he is alleged to have done so.   Proposed, planned, or actual payments from the FBI to sources (whether individuals or businesses) are characteristic of paid informants, who are consistently provided with express assurances of confidentiality.   Thus, the FBI must refuse to confirm or deny whether or not responsive records exist, as it does in any instance when records about an alleged confidential informant are sought.

### EXEMPTIONS 6 AND 7(C)

(52)    Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(6).   All information that applies to a particular person falls within the scope of Exemption 6.

(53)    Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(7)(C).

(54)    The FBI asserts Exemption 6 in conjunction with Exemption 7(C).   Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of

personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.   The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

(55)     Pursuant to long-standing policy, the FBI will not confirm or deny the existence of law enforcement records about a third party in the absence of a privacy waiver or proof of death, unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests.   The FBI instituted this policy in order to protect the privacy rights of individuals, particularly those who appear in FBI law enforcement files.   It is well-recognized that individuals have substantial privacy interests in relation to being associated with law enforcement investigations because any such association can engender comment, speculation, or harassment; can be embarrassing and stigmatizing; and can, in some circumstances, result in physical harm or threats of harm or death.   Statements by an individual alluding to or acknowledging an association with a law enforcement investigation do not extinguish his privacy interests or constitute a waiver of privacy interests.

(56)     If a requester establishes a public interest, then the FBI will balance that public interest against the third party's privacy interests.   This balancing is done on a case-by-case basis.   The FBI will process a request for and release non-exempt law enforcement records about a third party only if it determines that the public interest outweighs the individual's privacy interests after conducting the balancing analysis.   The balancing analysis in each case is

20

necessarily fact-specific.   Thus, each request must be treated individually, and the FBI must retain flexibility in the way in which it handles each request.

(57)     Here, Plaintiff has not submitted a privacy waiver and there is no indication that Steele is deceased.   In seeking public interest fee status and a fee waiver, Plaintiff made a bare assertion of public interest without any particularized argument that the specific records it sought would serve the public interest if disclosed.   *See* Exhibit A, p. 2.   Specifically, Plaintiff made no argument at all as to how or why revealing whether or not records about Mr. Steele exist would significantly increase the public's understanding of FBI operations and activities.   Thus, nothing in Plaintiff's request establishes a public interest sufficient to override Steele's substantial privacy interests.

(58)     Finally, although Orbis Business Intelligence as an entity does not have privacy interests, the FBI concluded that given the facts, circumstances, and context of, and the timeframe covered by, this request, confirming or denying whether or not responsive records about Orbis Business Intelligence exist would be tantamount to revealing whether or not responsive records about Steele exist.

## EXEMPTION 7(A)

(59)     FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings."   5 U.S.C. § 552(b)(7)(A).

21

(60)    In addition to satisfying Exemption 7's threshold, an agency must establish (a) a pending or prospective law enforcement proceeding that (b) could reasonably be expected to be adversely affected if responsive records are disclosed.

(61)    The FBI's investigation of Russian interference in the 2016 Presidential election is a pending enforcement proceeding.   As discussed above, Plaintiff's FOIA request implicates that investigation because the existence or nonexistence of records would tend to confirm or disprove the FBI's reliance on a specific confidential source in the investigation.

(62)    Moreover, the final element for Exemption 7(A)—interference with that investigation—is readily established.   Confirming or denying the existence or non-existence of responsive records would tend to imply non-public information about the focus, scope, and conduct of the investigation.   Specifically, it would tend to reveal whether or not a specific investigative technique and sources have been used—*i.e.*, whether Mr. Steele or Orbis Business Intelligence have or have not served as informants in the investigation—and whether or not particular allegations are part of the investigation—*i.e.*, the claims in the purported "dossier" attributed to Mr. Steele.

(63)    None of this information has been disclosed and prematurely disclosing it here would give targets and others intent on interfering with the FBI's investigative efforts the information necessary to: take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats.   For example, believing that Mr. Steele or Orbis Business Intelligence

had served as informants in the FBI's investigation of Russian interference in the 2016

Presidential election might lead an individual intent on interfering with that investigation to

harass or threaten Mr. Steele or take steps to interfere with his business; to harass or threaten

those thought to have been sources for the alleged 'dossier'; to destroy evidence that might

support or disprove allegations contained in the alleged 'dossier' or attempt to cause others to do

the same; or to fabricate evidence for the purpose of sowing confusion and obscuring the truth.

Accordingly, confirming or denying the existence or non-existence of responsive records here

could reasonably be expected to adversely impact the FBI's pending investigation into Russian

interference in the 2016 presidential election.

## CONCLUSION

(64)     The FBI can neither confirm nor deny the existence or non-existence of

responsive records here without violating interests protected by FOIA Exemptions 1, 3, 6, 7(A),

7(C), and 7(D).   Accordingly, the FBI has properly relied on a *Glomar* response to Plaintiff's

request.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through C attached hereto are true and correct copies.

Executed this 25th day of September, 2017.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

24