**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
JUDICIAL WATCH, INC.,                   )
                                        )
          Plaintiff,                    )
                                        )
          v.                            )          Case No. 1:17-cv-00916 (CRC)
                                        )
U.S. DEPARTMENT OF JUSTICE,             )
                                        )
          Defendant.                    )
_____)

**PLAINTIFF'S MOTION FOR RECONSIDERATION**
**OF THE COURT'S FEBRUARY 5, 2018 ORDER AND OPINION**

Plaintiff Judicial Watch, Inc., by counsel, respectfully submits this motion seeking

reconsideration under FRCP 59(e).  Plaintiff submits this request in light of the official

disclosure by the U.S. Government of relevant and material evidence that was not previously

available to Plaintiff or the Court.  As grounds thereof, Plaintiff states as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      Background.**

On February 5, 2018, this Court issued an Order and Memorandum Opinion

granting Defendant U.S. Department of Justice's summary judgment motion and denying

Plaintiff's cross-motion for summary judgment.  Dkt. Entry No. 19.  At issue was a FOIA

request for records relating to the so-called "Trump Dossier," a collection of memoranda

prepared by former British intelligence operative Christopher Steele during the 2016 presidential

election concerning then-candidate Donald J. Trump.  Specifically, Plaintiff's FOIA request to

the FBI sought the following:

- **Any and all records of communications between any official, employee, or representative of the Federal Bureau of Investigation and Mr. Christopher Steele, a former British intelligence officer and the owner of the private firm Orbis Business Intelligence.**

- **Any and all records regarding, concerning, or related to the proposed, planned, or actual payment of any funds to Mr. Steele and/or Orbis Business Intelligence.**

- **Any and all records produced in preparation for, during, or pursuant to any meetings or telephonic conversations between any official, employee, or representative of the Federal Bureau of Investigation and Mr. Christopher Steele and/or any employee or representative of Orbis Business Intelligence.**

The time frame of the request was identified as "January 1, 2016 to the present." The FBI refused to confirm or deny the existence of any such records, issuing a so-called *Glomar* response. The Court concluded that the FBI's *Glomar* response was proper as the records had not been publicly acknowledged.

On January 29, 2018, the House Permanent Select Committee on Intelligence ("House Committee") invoked Rule X, clause 11, of the House of Representatives and voted in favor of publicly disclosing a classified memorandum ("Nunes Memo") concerning, among other things, the FBI's interactions with Christopher Steele. By letter dated February 2, 2018, one business day before the Court's Order and Opinion in this case, White House Counsel Donald F. McGahn II – consistent with the procedures set forth in clause 11(g) of Rule X – informed the House Committee that President Trump was exercising his constitutional authority to declassify the U.S. Government information contained within the Nunes Memo. *See* Exhibit 1 (letter from the White House and Nunes Memo).

On February 24, 2018, the House Committee published a declassified version of a rebuttal memorandum (hereinafter referred to as the "Schiff Memo") responding to the Nunes Memo. *See* Exhibit 2 (letter from the Department of Justice describing its role in rendering the

declassification determination and Schiff Memo).  Like the Nunes Memo, the Schiff Memo was declassified and officially discloses the existence of records which the FBI had previously refused to confirm or deny.

## II.     Legal Standard.

This motion seeks relief under Rule 59(e) the Federal Rules of Civil Procedure. Judgments may be reconsidered under Rule 59(e) based on "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); *Nanko Shipping, USA v. Alcoa, Inc*., 118 F. Supp. 3d 372, 375 (D.D.C. 2015) (Rule 59(e) motions are "discretionary and need not be granted unless the court finds that there is 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (quoting *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006)).  In light of the availability of new evidence, it is well within the Court's discretion to reconsider its February 5, 2018 Order and Opinion.

## III.    Reconsideration Is Appropriate as the Existence of Responsive Records Has Been Officially Acknowledged.

By declassifying the Nunes Memo and the Schiff Memo, the U.S. Government now has publicly acknowledged the existence of specific records responsive to Plaintiff's request. *See* Exh. 1 Nunes Memo at 1.  The letter issued by the White House Counsel, which accompanies the Nunes Memo, plainly states that "the President has authorized the declassification of the Memorandum." *Id*. (Letter from White House Counsel at 2).  The Nunes Memo itself is stamped prominently with a notice that it is "Declassified by the order of the President." *Id*. (Nunes Memo at 1).  The Schiff Memo similarly is marked "UNCLASSIFIED."

The Nunes Memo confirms the extensive contacts between Steele and the FBI, as well as authorization by the FBI to pay Christopher Steele, author of the unverified "Steele Dossier," for information.  Specifically, the Nunes Memo confirms "Steele as a longtime FBI source" and that the "political origins of the Steele dossier were then known to senior DOJ and FBI officials." Exh. 1 (Nunes Memo at 2).   The Nunes Memo then confirms that the "FBI had separately authorized payment to Steele for the same information."  *Id*.  The Nunes Memo also discloses that "Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations – an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn*."  Id*.  The Nunes Memo then states that "Steele improperly concealed from and lied to the FBI about those contacts."  *Id*.

The Schiff Memo is even more expansive in confirming Steele's extensive contacts with the FBI and its actions related to those contacts.  These include

- "In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September – more than seven weeks later."  Exh. 2 (Schiff Memo at 1).

- "Steele's prior relationship with the FBI."  *Id*. at 2.

- "[T]he fact of and reason for his termination as a source."  *Id*.

- "Christopher Steele's reporting, which he began to share with an FBI agent [REDACTED] through the end of October 2016 . . . . *Id*. at 3.

- "In fact, Steele's reporting did not reach the counterintelligence team investigating Russia at FBI headquarters until mid-September 2016 . . . . *Id*.

- "The FBI's concern about and knowledge of Page's activities therefore <u>long predate</u> the FBI's receipt of Steele's information."  *Id*. at 4.

- "The Majority asserts that the FBI had 'separately authorized payment' to Steele for his research on Trump but neglects to mention that payment was cancelled and never made."  *Id*. at 6.

Each of these disclosures confirm communications between the FBI and Steele. They also confirm the proposed and apparently cancelled payment by the FBI to Steele. Each of these contacts would involve creation of records that would be responsive to one or more of Plaintiff's requests. For example, Steele's "reporting" to the FBI would involve records responsive to Plaintiff's first and likely third requests. In addition, Steele's termination as an FBI source would involve a communication between Steele and the FBI and again would be responsive to Plaintiff's first and likely third request. The cancelled payment to Steele is responsive to Plaintiff's second request seeking records on, among other things, "proposed" payments to Steele.

Notably, this extraordinary declassification of information already has had effects in other FOIA cases. In one case, in response to an inquiry by the Court, the U.S. Department of Justice confirmed that the Nunes Memo publicly acknowledges certain facts relating to FISA material and Carter Page. *See* Exh. 3 (Defendant's Response to Order, Dkt. Entry No. 32, *James Madison Project v. U.S. Dep't of Justice*, No. 1:17-cv-00597 (D.D.C.). In that case, DOJ withdrew, at least in part, its *Glomar* response concerning FISA warrants and orders identified in the Nunes Memo. *Id*. at 1. *See also* Dkt. Entry No. 40, Plaintiff's Motion for Reconsideration, *The James Madison Project v. U.S. Dep't of Justice*, Case No. 1:17-cv-00144-APM (D.D.C.). Similarly, in this case, a *Glomar* response is no longer available.

In light of the availability of important and directly relevant new evidence, reconsideration is appropriate and well within the Court's discretion. Counsel for Defendant has indicated that the government declines to take a position before seeing this motion for reconsideration but intends to submit a response after the motion is filed.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court exercise its

discretion and grant this motion and order Defendant to process the FOIA request.

Respectfully submitted,

JUDICIAL WATCH, INC.

/s/  James F. Peterson
James F. Peterson
DC Bar No. 450171
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5172
Fax:  (202) 646-5199
Email:  jpeterson@judicialwatch.org

*Counsel for Plaintiff*

March 5, 2018

# THE WHITE HOUSE

WASHINGTON

February 2, 2018

The Honorable Devin Nunes
Chairman, House Permanent Select Committee on Intelligence
United States Capitol
Washington, DC 20515


Dear Mr. Chairman:

On January 29, 2018, the House Permanent Select Committee on Intelligence (hereinafter "the Committee") voted to disclose publicly a memorandum containing classified information provided to the Committee in connection with its oversight activities (the "Memorandum," which is attached to this letter). As provided by clause 11(g) of Rule X of the House of Representatives, the Committee has forwarded this Memorandum to the President based on its determination that the release of the Memorandum would serve the public interest.

The Constitution vests the President with the authority to protect national security secrets from disclosure. As the Supreme Court has recognized, it is the President's responsibility to classify, declassify, and control access to information bearing on our intelligence sources and methods and national defense. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). In order to facilitate appropriate congressional oversight, the Executive Branch may entrust classified information to the appropriate committees of Congress, as it has done in connection with the Committee's oversight activities here. The Executive Branch does so on the assumption that the Committee will responsibly protect such classified information, consistent with the laws of the United States.

The Committee has now determined that the release of the Memorandum would be appropriate. The Executive Branch, across Administrations of both parties, has worked to accommodate congressional requests to declassify specific materials in the public interest.[1] However, public release of classified information by unilateral action of the Legislative Branch is extremely rare and raises significant separation of powers concerns. Accordingly, the Committee's request to release the Memorandum is interpreted as a request for declassification pursuant to the President's authority.

The President understands that the protection of our national security represents his highest obligation. Accordingly, he has directed lawyers and national security staff to assess the

---

[1] *See, e.g.*, S. Rept. 114-8 at 12 (Administration of Barack Obama) ("On April 3, 2014 . . . the Committee agreed to send the revised Findings and Conclusions, and the updated Executive Summary of the Committee Study, to the President for declassification and public release."); H. Rept. 107-792 (Administration of George W. Bush) (similar); E.O. 12812 (Administration of George H.W. Bush) (noting Senate resolution requesting that President provide for declassification of certain information via Executive Order).

declassification request, consistent with established standards governing the handling of classified information, including those under Section 3.1(d) of Executive Order 13526. Those standards permit declassification when the public interest in disclosure outweighs any need to protect the information. The White House review process also included input from the Office of the Director of National Intelligence and the Department of Justice. Consistent with this review and these standards, the President has determined that declassification of the Memorandum is appropriate.

Based on this assessment and in light of the significant public interest in the memorandum, the President has authorized the declassification of the Memorandum. To be clear, the Memorandum reflects the judgments of its congressional authors. The President understands that oversight concerning matters related to the Memorandum may be continuing. Though the circumstances leading to the declassification through this process are extraordinary, the Executive Branch stands ready to work with Congress to accommodate oversight requests consistent with applicable standards and processes, including the need to protect intelligence sources and methods.

Sincerely,

Donald F. McGahn II
Counsel to the President


cc: The Honorable Paul Ryan
    Speaker of the House of Representatives

    The Honorable Adam Schiff
    Ranking Member, House Permanent Select Committee on Intelligence

UNCLASSIFIED ~~TOP SECRET//NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:        HPSCI Majority Members

From:      HPSCI Majority Staff

Subject:   Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
           Federal Bureau of Investigation

## Purpose

This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle. Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

## Investigation Update

On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order
(not under Title VII) authorizing electronic surveillance on Carter Page from the FISC. Page is a
U.S. citizen who served as a volunteer advisor to the Trump presidential campaign. Consistent
with requirements under FISA, the application had to be first certified by the Director or Deputy
Director of the FBI. It then required the approval of the Attorney General, Deputy Attorney
General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security
Division.

The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA
renewals from the FISC. As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an
American citizen must be renewed by the FISC every 90 days and each renewal requires a
separate finding of probable cause. Then-Director James Comey signed three FISA applications
in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one. Then-DAG
Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more
FISA applications on behalf of DOJ.

Due to the sensitive nature of foreign intelligence activity, FISA submissions (including
renewals) before the FISC are classified. As such, the public's confidence in the integrity of the
FISA process depends on the court's ability to hold the government to the highest standard—
particularly as it relates to surveillance of American citizens. However, the FISC's rigor in
protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance
orders, is necessarily dependent on the government's production to the court of all material and
relevant facts. This should include information potentially favorable to the target of the FISA

~~TOP SECRET//NOFORN~~

application that is known by the government.  In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts.  However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application.  Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier).  The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow.  This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News.* The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News.*  Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS.  Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn.  Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

**UNCLASSIFIED**

~~TOP SECRET//NOFORN~~

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

b) Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3) Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing Ohr, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he "**was desperate that Donald Trump not get elected and was passionate about him not being president.**" This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

a) During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4) According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

# UNCLASSIFIED

~~TOP SECRET//NOFORN~~

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

# UNCLASSIFIED

~~TOP SECRET//NOFORN~~

UNCLASSIFIED

~~TOP SECRET//NOFORN~~

**TO:** All Members of the House of Representatives
**FROM:** HPSCI Minority
**DATE:** January 29, 2018
**RE: Correcting the Record – The Russia Investigations**

The HPSCI Majority's move to release to the House of Representatives its allegations against the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) is a transparent effort to undermine those agencies, the Special Counsel, and Congress' investigations. It also risks public exposure of sensitive sources and methods for no legitimate purpose.

FBI and DOJ officials did <u>not</u> "abuse" the Foreign Intelligence Surveillance Act (FISA) process, omit material information, or subvert this vital tool to spy on the Trump campaign.

In fact, DOJ and the FBI would have been remiss in their duty to protect the country had they not sought a FISA warrant and repeated renewals to conduct temporary surveillance of Carter Page, someone the FBI assessed to be an agent of the Russian government. DOJ met the <u>rigor, transparency, and evidentiary basis</u> needed to meet FISA's probable cause requirement, by demonstrating:

- o   contemporaneous evidence of Russia's election interference;
- o   concerning Russian links and outreach to Trump campaign officials;
- o   Page's history with Russian intelligence; and
- o   ▮▮▮▮▮▮▮▮▮▮▮▮▮ Page's suspicious activities in 2016, including in Moscow.

The Committee's Minority has therefore prepared this memorandum to correct the record:

- **Christopher Steele's raw intelligence reporting did <u>not</u> inform the FBI's decision to initiate its counterintelligence investigation in late July 2016.** In fact, the FBI's closely-held investigative team only received Steele's reporting in mid-September – more than seven weeks later. The FBI – and, subsequently, the Special Counsel's – investigation into links between the Russian government and Trump campaign associates has been based on troubling law enforcement and intelligence information <u>unrelated</u> to the "dossier."

- **DOJ's October 21, 2016 FISA application and three subsequent renewals carefully outlined for the Court a multi-pronged rationale for surveilling Page,** who, at the time of the first application, was no longer with the Trump campaign. DOJ detailed Page's past relationships with Russian spies and interaction with Russian officials during the 2016 campaign, ▮▮▮▮▮▮▮▮▮▮▮. DOJ cited multiple sources to support the case for surveilling Page — but made only narrow use of information from Steele's sources about Page's specific activities in 2016, chiefly his suspected July 2016 meetings in Moscow with Russian officials. ▮▮▮▮▮▮▮▮▮▮▮▮. In fact, the FBI interviewed Page in March 2016 about his contact with Russian intelligence, the very month candidate Donald Trump named him a foreign policy advisor.

As DOJ informed the Court in subsequent renewals, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Steele's reporting about Page's Moscow meetings** ▮▮▮▮▮▮▮▮▮▮. DOJ's
applications did <u>not</u> otherwise rely on Steele's reporting, including any "salacious" allegations

~~TOP SECRET//NOFORN~~



UNCLASSIFIED

TOP SECRET//NOFORN

about Trump, and the FBI never paid Steele for this reporting. While explaining why the FBI viewed Steele's reporting and sources as reliable and credible, DOJ also disclosed:

- Steele's prior relationship with the FBI;
- the fact of and reason for his termination as a source; and
- the assessed political motivation of those who hired him.

- **The Committee Majority's memorandum, which draws selectively on highly sensitive classified information, includes other distortions and misrepresentations** that are contradicted by the underlying classified documents, which the vast majority of Members of the Committee and the House have not had the opportunity to review – and which Chairman Nunes chose not to read himself.[1]

## Background

On January 18, 2018, the Committee Majority, during an unrelated business meeting, forced a surprise vote to release to the full House a profoundly misleading memorandum alleging serious abuses by the FBI and DOJ. Majority staff drafted the document in secret on behalf of Chairman Devin Nunes (and reportedly with guidance and input from Rep. Trey Gowdy), and then rushed a party-line vote without prior notice.

This was by design. The overwhelming majority of Committee Members never received DOJ authorization to access the underlying classified information, and therefore could not judge the veracity of Chairman Nunes' claims. Due to sensitive sources and methods, DOJ provided access only to the Committee's Chair and Ranking Member (or respective designees), and limited staff, to facilitate the Committee's investigation into Russia's covert campaign to influence the 2016 U.S. elections.[2] As DOJ has confirmed publicly, it did not authorize the broader release of this information within Congress or to the public, and Chairman Nunes refused to allow DOJ and the FBI to review his document until he permitted the FBI Director to see it for the first time in HPSCI's secure spaces late on Sunday, January 28 – 10 days after disclosure to the House.[3]

## FBI's Counterintelligence Investigation

In its October 2016 FISA application and subsequent renewals, DOJ accurately informed the Court that the FBI initiated its counterintelligence investigation on July 31, 2016, after receiving information ███████████████. George Papadopoulos revealed ███████ that individuals linked to Russia, who took interest in Papadopoulos as a Trump campaign foreign policy adviser, informed him in late April 2016 that Russia ████████████ ███████████████████████████████.[4] Papadopoulos's disclosure, moreover, occurred against **the backdrop of Russia's aggressive covert campaign to influence our elections, which the FBI was already monitoring.** We would later learn in Papadopoulos's plea that that the information the Russians could assist by anonymously releasing were thousands of Hillary Clinton's emails.[5]

DOJ told the Court the truth. Its representation was consistent with the FBI's underlying investigative record, which current and former senior officials later corroborated in extensive

TOP SECRET//NOFORN



UNCLASSIFIED

UNCLASSIFIED

~~TOP SECRET//NOFORN~~

Committee testimony. Christopher Steele's reporting, which he began to share with an FBI agent ████████ ████████████████ through the end of October 2016, **played no role** in launching the FBI's counterintelligence investigation into Russian interference and links to the Trump campaign. In fact, Steele's reporting did not reach the counterintelligence team investigating Russia at FBI headquarters until mid-September 2016, more than seven weeks after the FBI opened its investigation, because the probe's existence was so closely held within the FBI.[6] By then, the FBI had already opened sub-inquiries into ████ individuals linked to the Trump campaign: ████████████████████████████████████████████████████████ ████████████████ and former campaign foreign policy advisor **Carter Page**.

As Committee testimony bears out, the FBI would have continued its investigation, including against ████████ individuals, even if it had never received information from Steele, never applied for a FISA warrant against Page, or if the FISC had rejected the application.[7]

### DOJ's FISA Application and Renewals

The initial warrant application and subsequent renewals received independent scrutiny and approval by four different federal judges, ~~three~~ of whom were appointed by President George W. *one by George H.W.Bush* Bush and one by President Ronald Reagan. DOJ first applied to the FISC on October 21, 2016 for a warrant to permit the FBI to initiate electronic surveillance and physical search of Page for 90 days, consistent with FISA requirements. The Court approved three renewals – in early January 2017, early April 2017, and late June 2017 – which authorized the FBI to maintain surveillance on Page until late September 2017. Senior DOJ and FBI officials appointed by the Obama and Trump Administrations, including acting Attorney General Dana Boente and Deputy Attorney General Rod Rosenstein, certified the applications with the Court.

**FISA was not used to spy on Trump or his campaign.** As the Trump campaign and Page have acknowledged, Page ended his formal affiliation with the campaign months before DOJ applied for a warrant. DOJ, moreover, submitted the initial application less than three weeks before the election, even though the FBI's investigation had been ongoing since the end of July 2016.

DOJ's warrant request was based on compelling evidence and probable cause to believe Page was knowingly assisting clandestine Russian intelligence activities in the U.S.:

- **Page's Connections to Russian Government and Intelligence Officials:** The FBI had an independent basis for investigating Page's motivations and actions during the campaign, transition, and following the inauguration. As DOJ described in detail to the Court, Page had an extensive record as ████████████████████████████████████████████████████████ ████████████[8] prior to joining the Trump campaign. He resided in Moscow from 2004-2007 and pursued business deals with Russia's state-owned energy company Gazprom—████████████████████████████████████████████████████████[9] As early as ████████, a Russian intelligence officer ████████████████ targeted Page for recruitment. Page showed ████████████████████████████.

~~TOP SECRET//NOFORN~~



UNCLASSIFIED

**Page remained on the radar of Russian intelligence and the FBI.** In 2013, prosecutors indicted three other Russian spies, two of whom targeted Page for recruitment. The FBI also interviewed Page multiple times about his Russian intelligence contacts, including in March 2016.[10] The FBI's concern about and knowledge of Page's activities therefore <u>long predate</u> the FBI's receipt of Steele's information.

- **Page's Suspicious Activity During the 2016 Campaign:** The FISA applications also detail Page's suspicious activity after joining the Trump campaign in March 2016. ████████████ ██████████████████████████████████ Page traveled to Moscow in July 2016, during which he gave a university commencement address – an honor usually reserved for well-known luminaries.

  - It is in this specific sub-section of the applications that DOJ refers to Steele's reporting on Page and his alleged coordination with Russian officials. Steele's information about Page was consistent with the FBI's assessment of Russian intelligence efforts to recruit him and his connections to Russian persons of interest.

  - In particular, Steele's sources reported that Page met separately while in Russia with Igor Sechin, a close associate of Vladimir Putin and executive chairman of Rosneft, Russia's state-owned oil company, and Igor Divyekin, a senior Kremlin official. Sechin allegedly discussed the prospect of future U.S.-Russia energy cooperation and "an associated move to lift Ukraine-related western sanctions against Russia." Divyekin allegedly disclosed to Page that the Kremlin possessed compromising information on Clinton ("kompromat") and noted "the possibility of its being released to Candidate #1's campaign."[11] [*Note*: "Candidate #1" refers to candidate Trump.] This closely tracks what other Russian contacts were informing another Trump foreign policy advisor, George Papadopoulos.

- In subsequent FISA renewals, **DOJ provided additional information obtained through multiple independent sources that corroborated Steele's reporting.**

  - ████████████████████████████████████████████████ ████████████████████████████████████████████[12]

  - ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

  - Page's ███████████████████████████████ in Moscow with senior Russian officials ███████████████ as well as meetings with Russian officials ████████████████████████████[13]

This information contradicts Page's November 2, 2017 testimony to the Committee, in which he initially denied any such meetings and then was forced to admit speaking with





TOP SECRET//NOFORN

Dvorkovich and meeting with Rosneft's Sechin-tied investor relations chief, Andrey Baranov.

- **The Court-approved surveillance of Page allowed FBI to collect valuable intelligence.** The FISA renewals demonstrate that the FBI collected important investigative information and leads by conducting Court-approved surveillance. For instance, ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

  DOJ also documented evidence that Page ████████████████████████████ ████████████████████████████████████████, anticipated ████████ ████████████████████████ and repeatedly contacted ████████████████ ██████████ in an effort to present himself as ████████████████ ████████[15]███████████████████████[16]

  Page's efforts to ████████████████████████████████████████ also contradict his sworn testimony to our Committee.

## DOJ's Transparency about Christopher Steele

**Far from "omitting" material facts about Steele, as the Majority claims,[17] DOJ repeatedly informed the Court about Steele's background, credibility, and potential bias.** DOJ explained in detail Steele's prior relationship with and compensation from the FBI; his credibility, reporting history, and source network; the fact of and reason for his termination as a source in late October 2016; and the likely political motivations of those who hired Steele.

- **DOJ was transparent with Court about Steele's sourcing:** The Committee Majority, which had earlier accused Obama Administration officials of improper "unmasking," faults DOJ for not revealing the names of specific U.S. persons and entities in the FISA application and subsequent renewals. In fact, DOJ appropriately upheld its longstanding practice of protecting U.S. citizen information by purposefully not "unmasking" U.S. person and entity names, unless they were themselves the subject of a counterintelligence investigation. DOJ instead used generic identifiers that provided the Court with more than sufficient information to understand the political context of Steele's research. In an extensive explanation to the Court, DOJ discloses that Steele

  *"was approached by an identified U.S. Person,[18] who indicated to Source #1 [Steele][19] that a U.S.-based law firm[20] had hired the identified U.S. Person to conduct research regarding Candidate #1's[21] ties to Russia. (The identified U.S. Person and Source #1 have a long-standing business relationship.) The identified U.S. person hired Source #1 to conduct this research. The identified U.S. Person never advised Source #1 as to the motivation behind the research into Candidate #1's ties to Russia. The FBI speculates that the identified U.S. Person was likely looking for information that could be used to discredit Candidate #1's campaign."[22]*

Contrary to the Majority's assertion that DOJ fails to mention that Steele's research was commissioned by "political actors" to "obtain derogatory information on Donald Trump's ties to Russia,"[23] **DOJ in fact informed the Court accurately that Steele was hired by**

TOP SECRET//NOFORN


UNCLASSIFIED

TOP SECRET/NOFORN

politically-motivated U.S. persons and entities and that his research appeared intended for use "to discredit" Trump's campaign.

- **DOJ explained the FBI's reasonable basis for finding Steele credible:** The applications correctly described Steele as ███████████████████████████████████████. The applications also reviewed Steele's multi-year history of credible reporting on Russia and other matters, including information DOJ used in criminal proceedings.[24] Senior FBI and DOJ officials have repeatedly affirmed to the Committee the reliability and credibility of Steele's reporting, an assessment also reflected in the FBI's underlying source documents.[25] The FBI has undertaken a rigorous process to vet allegations from Steele's reporting, including with regard to Page.[26]

- **The FBI properly notified the FISC after it terminated Steele as a source for making unauthorized disclosures to the media.** The Majority cites no evidence that the FBI, prior to filing its initial October 21, 2016 application, actually knew or should have known of any allegedly inappropriate media contacts by Steele. Nor do they cite evidence that Steele disclosed to *Yahoo!* details included in the FISA warrant, since the British Court filings to which they refer do not address what Steele may have said to *Yahoo!*.

  DOJ informed the Court in its renewals that the FBI acted promptly to terminate Steele after learning from him (after DOJ filed the first warrant application) that he had discussed his work with a media outlet in late October. The January 2018 renewal further explained to the Court that Steele told the FBI that he made his unauthorized media disclosure because of his frustration at Director Comey's public announcement shortly before the election that the FBI reopened its investigation into candidate Clinton's email use.

- **DOJ never paid Steele for the "dossier":** The Majority asserts that the FBI had "separately authorized payment" to Steele for his research on Trump but neglects to mention that payment was cancelled and never made. As the FBI's records and Committee testimony confirms, although the FBI initially considered compensation ██████████████████ ███████████████████████, **Steele ultimately never received payment from the FBI for any "dossier"-related information.**[27] DOJ accurately informed the Court that Steele had been an FBI confidential human source since ████, for which he was "compensated ██████████████ by the FBI" -- payment for previously-shared information of value unrelated to the FBI's Russia investigation.[28]

## Additional Omissions, Errors, and Distortions in the Majority's Memorandum

- **DOJ appropriately provided the Court with a comprehensive explanation of Russia's election interference, including evidence that Russia courted another Trump campaign advisor, Papadopoulos, and that Russian agents previewed their hack and dissemination of stolen emails.** In claiming that there is "no evidence of any cooperation or conspiracy between Page and Papadopoulos,"[29] the Majority misstates the reason why DOJ specifically explained Russia's courting of Papadopoulos. Papadopoulos's interaction with Russian agents, coupled with real-time evidence of Russian election interference, provided the Court with a broader context in which to evaluate Russia's clandestine activities and Page's history and alleged contact with Russian officials. Moreover, since only Page ████

TOP SECRET/NOFORN




UNCLASSIFIED

UNCLASSIFIED

TOP SECRET//NOFORN

███████████████, no evidence of a separate conspiracy between him and
Papadopoulos was required. **DOJ would have been negligent in omitting vital information
about Papadopoulos and Russia's concerted efforts.**

- **In its Court filings, DOJ made proper use of news coverage.** The Majority falsely claims
that the FISA materials "relied heavily" on a September 23, 2016 *Yahoo!* News article by
Michael Isikoff and that this article "does not corroborate the Steele Dossier because it is
derived from information leaked by Steele himself." [30] In fact, DOJ referenced Isikoff's
article, alongside another article the Majority fails to mention, not to provide separate
corroboration for Steele's reporting, but instead to inform the Court of Page's public denial
of his suspected meetings in Moscow, which Page also echoed in a September 25, 2016 letter
to FBI Director Comey. ███████████████
███████████████████ [31]

- **The Majority's reference to Bruce Ohr is misleading.** The Majority mischaracterizes
Bruce Ohr's role, overstates the significance of his interactions with Steele, and misleads
about the timeframe of Ohr's communication with the FBI. In late November 2016, Ohr
informed the FBI of his prior professional relationship with Steele and information that
Steele shared with him (including Steele's concern about Trump being compromised by
Russia). He also described his wife's contract work with Fusion GPS, the firm that hired
Steele separately. This occurred weeks <u>after</u> the election and more than a month <u>after</u> the
Court approved the initial FISA application. The Majority describes Bruce Ohr as a senior
DOJ official who "worked closely with the Deputy Attorney General, Yates and later
Rosenstein," in order to imply that Ohr was somehow involved in the FISA process, but there
is no indication this is the case.

  Bruce Ohr is a well-respected career professional whose portfolio is drugs and organized
  crime, not counterintelligence. There is no evidence that he would have known about the
  Page FISA applications and their contents. The Majority's assertions, moreover, are
  irrelevant in determining the veracity of Steele's reporting. By the time Ohr debriefs with the
  FBI, it had already terminated Steele as a source and was independently corroborating
  Steele's reporting about Page's activities. Bruce Ohr took the initiative to inform the FBI of
  what he knew, and the Majority does him a grave disservice by suggesting he is part of some
  malign conspiracy.

- **Finally, Peter Strzok and Lisa Page's text messages are irrelevant to the FISA
application.** The Majority gratuitously includes reference to Strzok and Page at the end of
their memorandum, in an effort to imply that political bias infected the FBI's investigation
and DOJ's FISA applications. In fact, neither Strzok nor Page served as affiants on the
applications, which were the product of extensive and senior DOJ and FBI review. [32] In
demonizing both career professionals, the Majority accuses them of "orchestrating leaks to
the media" – a serious charge; omits inconvenient text messages, in which they critiqued a
wide range of other officials and candidates from both parties; does not disclose that FBI
Deputy Director McCabe testified to the Committee that he had no idea what Page and
Strzok were referring to in their "insurance policy" texts; [33] and ignores Strzok's
acknowledged role in preparing a public declaration, by then Director Comey, about former
Secretary Clinton's "extreme carelessness" in handling classified information—which greatly
damaged Clinton's public reputation in the days just prior to the presidential election.

TOP SECRET//NOFORN

UNCLASSIFIED

... 

UNCLASSIFIED

TOP SECRET//NOFORN

---

[1] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[2] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018. DOJ also confirmed in writing to Minority Staff DOJ and FBI's terms of review:

> the Department has accommodated HPSCI's oversight request by allowing repeated in camera reviews of the material in an appropriate secure facility under the general stipulations that (1) **the Chair (or his delegate) and the Ranking Member (or his delegate) and two staff each, with appropriate security clearances,** are allowed to review on behalf of the Committee, (2) that the review take place in a reading room set up at the Department, and (3) that the documents not leave the physical control of the Department, and (5) that the review opportunities be bipartisan in nature. Though we originally requested that no notes be taken, in acknowledgment of a request by the Committee and recognizing that the volume of documents had increased with time, the Department eventually allowed notes to be taken to facilitate HPSCI's review. Also, initial reviews of the material include [sic] short briefings by Department officials to put the material in context and to provide some additional information.

Email from Stephen Boyd to HPSCI Minority Staff, January 18, 2018 (emphasis supplied).

[3] Letter to HPSCI Chairman Devin Nunes, Assistant Attorney General Stephen Boyd, Department of Justice, January 24, 2018.

[4]


[5] Papadopoulos's October 5, 2017 guilty plea adds further texture to this initial tip, by clarifying that a Russian agent told Papadopoulos that "They [the Russians] have dirt on her"; "the Russians had emails of Clinton"; "they have thousands of emails." *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia), p. 7.

[6]


[7] Under the Special Counsel's direction, Flynn and Papadopoulos have both pleaded guilty to lying to federal investigators and are cooperating with the Special Counsel's investigation, while Manafort and his long-time aide, former Trump deputy campaign manager Rick Gates, have been indicted on multiple counts and are awaiting trial. See *U.S. v. Michael T. Flynn* (1:17-cr-232, District of Columbia); *U.S. v. Paul J. Manafort, Jr., and Richard W. Gates III* (1:17-cr-201, District of Columbia); *U.S. v. George Papadopoulos* (1:17-cr-182, District of Columbia).

[8]


[9]

[10]
See also, *U.S. v. Evgeny Buryakov, a/k/a "Zhenya," Igor Sporyshev, and Victor Podobnyy*, U.S. Southern District of New York, January 23, 2015.

[11] Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p.18. Repeated in subsequent renewal applications

[12] Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

TOP SECRET//NOFORN



UNCLASSIFIED

UNCLASSIFIED

TOP SECRET//NOFORN

¹³ ███████████████████████

¹⁴ ████████████████████████████████████ the FBI and broader Intelligence Community's high confidence assessment that the Russian government was engaged in a covert interference campaign to influence the 2016 election, including that Russian intelligence actors "compromised the DNC" and WikiLeaks subsequently leaked in July 2016 "a trove" of DNC emails. Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 6-7. Repeated and updated with new information in subsequent renewal applications. Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 20-21.

¹⁵ Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, pp. 36, 46, 48.

¹⁶ Department of Justice, Foreign Intelligence Surveillance Court Application, June 29, 2017, p. 56.

¹⁷ HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, pp. 2-3 (enumerating "omissions" of fact, regarding Steele and his activities, from the Page FISA applications).

¹⁸ Glenn Simpson.

¹⁹ Christopher Steele.

²⁰ Perkins Coie LLP.

²¹ Donald Trump.

²² Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

²³ HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 2.

²⁴ Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 15, footnote 8. Repeated in subsequent renewal applications.

²⁵ Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 46, 100; Interview of Sally Yates (former Deputy Attorney General), House Permanent Select Committee on Intelligence, November 3, 2017, p. 16; Interview with John Carlin (former Assistant Attorney General for National Security), House Permanent Select Committee on Intelligence, July, 2017, p. 35.

²⁶ Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 100-101, 115.

²⁷ Interview of FBI Agent, House Permanent Select Committee on Intelligence, December 20, 2017, p. 112.

²⁸ Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, pp. 15-16, n. 8. Repeated in subsequent renewal applications.

²⁹ HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 4 ("The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos.")

³⁰ HPSCI Majority Memorandum, *Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation,* January 18, 2018, p. 2. Neither Isikoff nor *Yahoo!* are specifically identified in the FISA Materials, in keeping with the FBI's general practice of not identifying U.S. persons.

³¹ Department of Justice, Foreign Intelligence Surveillance Court Application, October 21, 2016, p. 25; Department of Justice, Foreign Intelligence Surveillance Court Application, January 12, 2017, p. 31; Carter Page, Letter to FBI Director James Comey, September 25, 2016.

TOP SECRET//NOFORN



UNCLASSIFIED

UNCLASSIFIED

TOP SECRET//NOFORN

[32]

[33] Interview of Andrew McCabe (FBI Deputy Director), House Permanent Select Committee on Intelligence, December 19, 2017, p. 157.

TOP SECRET//NOFORN

UNCLASSIFIED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MADISON PROJECT, et al.,    ) | |
|                            ) | |
|   Plaintiffs,                  ) | |
|                            ) | |
| v.                             ) | |
|                            ) | Case No. 17-597-APM |
| UNITED STATES DEPARTMENT OF JUSTICE, ) | |
|                            ) | |
|   Defendant.                  ) | |
|                            ) | |

## DEFENDANT'S RESPONSE TO ORDER

By Minute Order dated February 2, 2018, the Court instructed that by February 14, 2018, "Defendant shall notify the court whether the release of the 'Nunes Memo' referenced in Plaintiffs' Notice of Supplemental Information affects Defendant's blanket Glomar response to Plaintiffs' FOIA request," and further that "[i]f Defendant maintains that the Nunes Memo's release does not in any way change the agency's Glomar response, it shall set forth its justification for that position."  Defendant hereby submits its response.

(1) On February 2, 2018, Congress released the document that Plaintiffs attached to their Notice of Supplemental Authority and which the Court refers to as the "Nunes Memo."

(2) The President declassified the memorandum, which included references to the existence of FISA material related to Carter Page.  Although Carter Page separated from the Trump campaign before the initial FISA order was obtained, the FISA applications are potentially responsive to the request for applications regarding "people associated with President Trump."  Accordingly, Defendant withdraws the Glomar response as to the existence of the Page FISA applications and orders identified in the Nunes Memo.

(3)  Declassification by the President of the existence of the Page FISA applications and

orders identified in the Nunes Memo requires the government to carefully review those

materials to determine what information contained in them has been declassified and if

they are responsive to Plaintiff's request.

(4)  Given recent events, and the possibility of additional declassifications by the President,

the government is unable at this time to propose a timetable to conduct this review.

(5)  The government requests that current motions be terminated as moot and requests 30

days to confer with Plaintiffs' counsel and propose a reasonable schedule for the

government to make additional disclosures of records, if any, and to re-brief summary

judgment, including asserting any remaining partial Glomar response.

Dated: February 14, 2018                           Respectfully Submitted,

CHAD READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/Amy E. Powell*
AMY E. POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                 )
JUDICIAL WATCH, INC.,         )
                                 )
             Plaintiff,      )
                                 )
          v.           )     Case No. 1:17-cv-00916 (CRC)
                                 )
U.S. DEPARTMENT OF      )
JUSTICE,                     )
                                 )
            Defendant.    )
_____)

**[PROPOSED] ORDER**

Having considered Plaintiff's Motion for Reconsideration of the Court's February 5, 2018:

It is hereby **ORDERED** that the motion is granted and that Defendant process Plaintiff's FOIA request.

Dated: _____, 2018.     _____
                                               Hon. Christopher R. Cooper
                                             U.S. District Judge