IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

    Plaintiff,

          v.                  Case No. 17-cv-916 (CRC)

UNITED STATES DEPARTMENT OF
JUSTICE,

    Defendant.

## SECOND DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"),

in Winchester, Virginia.[1]   I have held this position since August 1, 2002.   Prior to my joining

the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the

Navy for Civil Law.   In that capacity, I had direct oversight of Freedom of Information Act

("FOIA") policy, procedures, appeals, and litigation for the Navy.   From October 1, 1980 to

April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked

with FOIA matters.   I am also an attorney who has been licensed to practice law in the State of

Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 247

employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters

---

[1] IMD was previously known as the Records Management Division.

1

("FBIHQ") units and three (3) field operational service center units whose collective mission is

to effectively plan, develop, direct, and manage responses to requests for access to FBI records

and information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and

the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential,

Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and

Congressional directives.   My responsibilities also include the review of FBI information for

classification purposes as mandated by E.O. 13526, 75 Fed. Reg. 707 (2010), and the preparation

of declarations in support of Exemption (b)(1) claims under the FOIA.   I have been designated

by the Attorney General of the United States as an original classification authority, and a

declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.   The statements

contained in this declaration are based upon my personal knowledge, upon information provided

to me in my official capacity, and upon conclusions and determinations reached and made in

accordance therewith.

 (3) Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.   Specifically, I am

aware of the FBI's handling of Plaintiff's FOIA request for certain records concerning

Christopher Steele, a former confidential intelligence source for the FBI.

 (4) This declaration is being submitted in support of DOJ's renewed motion for

summary judgment.   It supercedes my first declaration, which was filed in support of DOJ's

original motion for summary judgment.   *See* ECF No. 9-1, Declaration of David M. Hardy

(hereafter, "First Hardy Declaration").   This declaration explains the administrative history of

Plaintiff's request and describes the FBI's recordkeeping system; the procedures used to search

for, review, and process responsive records subject to the FOIA; and the FBI's justifications for

withholding records in part or in full pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(6),

(b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E).

## BACKGROUND

(5)     By letter dated March 8, 2017, Plaintiff submitted a FOIA request to the FBI. *See*

ECF No. 9-1, First Hardy Declaration, Exhibit A.

(6)     Plaintiff requested:

[1]     Any and all records of communication between any official, employee, or representative of the [FBI] and Mr. Christopher Steele, a former British intelligence officer and the owner of the private firm Orbis Business Intelligence.

[2]     Any and all records regarding, concerning, or related to the proposed, planned, or actual payment of any funds to Mr. Steele and/or Orbis Business Intelligence.

[3]     Any and all records produced in preparation for, during, or pursuant to any meetings or telephonic conversations between any official, employee, or representative of the [FBI] and Mr. Christopher Steele and/or any employee or representative of Orbis Business Intelligence.

*Id.* at 1.   The FBI acknowledged receipt of plaintiff's request in a letter dated April 3, 2017, and

assigned it FOIPA Request No. 1370340-000.   *See id.* at Exhibit B.

(7)     On May 16, 2017, the FBI responded to Plaintiff's FOIA request by refusing to

confirm or deny the existence or non-existence of responsive records (*i.e.*, a "Glomar" response).

(8)     Also on May 16, 2017, Plaintiff filed the present lawsuit.

(9)     On September 25, 2017, DOJ moved for summary judgment, defending its

Glomar response.   *See* ECF No. 9, Motion for Summary Judgment.

3

(10)   On February 5, 2018, this Court granted the FBI's motion and denied Plaintiff's cross-motion for summary judgment.   *See* ECF Nos. 18 and 19, Order and Opinion Granting Defendant's Motion for Summary Judgment and Denying Plaintiff's Cross-Motion for Summary Judgment.

(11)   On March 5, 2018, Plaintiff moved for reconsideration of this Court's February 5 decision.   *See* ECF No. 20, Motion for Reconsideration.   Specifically, Plaintiff alleged that the declassification and disclosure of the so-called Nunes Memo (discussed below), which occurred just days before this Court's decision (on February 2, 2018), pierced the FBI's Glomar response. DOJ did not oppose that motion and instead notified the Court that it was withdrawing its Glomar response in light of the declassification and disclosure of the Nunes Memo.   *See* ECF No. 21, Response to Motion for Reconsideration.   On March 26, 2018, the Court vacated its decision.   *See* Minute Order of March 26, 2018.

(12)   Thereafter, the FBI searched for and processed records responsive to Plaintiff's FOIA request.   The FBI made the non-exempt portions of those records available to Plaintiff by publishing them on its FOIA electronic reading room, The Vault, about which Plaintiff was notified in letters dated August 3 and August 31, 2018.[2]   *See* **Exhibits A and B**.

## PRIOR PUBLIC DISCLOSURES ABOUT STEELE

### THE "NUNES" MEMO

(13)   Prior to February 2018, a memorandum was authored for Devin Nunes, Chairman of the House Permanent Select on Intelligence (HPSCI), by his staff (hereafter "the Nunes

---

[2]   Because the FBI had received three or more requests for the same/substantially similar records, it was required to make them available in the electronic reading room pursuant to 5 U.S.C. § 552(a)(2)(D)(iii).

Memo") regarding Foreign Intelligence Surveillance Act (FISA) surveillance of Carter Page by

the FBI.   As originally drafted, the Nunes Memo was classified because it revealed FISA-

authorized surveillance of an identified target – Carter Page.[3]

(14)    HPSCI voted to release the Nunes Memo publicly but could not immediately do

so because it was classified at the Top Secret level.   Thus, pursuant to clause 11(g) of Rule X of

the House of Representatives, HPSCI forwarded the Nunes Memo to President Trump with a

request to declassify it.   The declassification request did not ask the President to opine on the

contents, judgment, or opinions reflected in the memorandum.

(15)    The Nunes Memo revealed that intelligence reporting provided to the FBI by

Christopher Steele was part of the FISA applications submitted by DOJ to the Foreign

Intelligence Surveillance Court (FISC).   The memorandum represents the judgments of its

authors and is not a product of the Executive Branch.   It summarizes, characterizes, and offers

opinions about various documents reviewed by HPSCI staff members, including the much

lengthier and more detailed FISA applications submitted by the Department of Justice (DOJ) to

the Foreign Intelligence Surveillance Court (FISC) and the orders obtained from the FISC in

response thereto.

(16)    On February 2, 2018, President Trump declassified the Nunes Memo "in light of

the significant public interest in the memorandum."   *See id.,* Letter from Donald F. McGahn II,

---

[3] Under classification rules, an entire document is classified if any single piece of information in it is classified.   So, for example, an entire document is classified as Top Secret if it contains any Top Secret information, even if it also contains Secret, Confidential, or unclassified information.   Moreover, information that by itself is unclassified can become classified when combined or associated with other unclassified or classified information, if the compiled information reveals an association or relationship that meets the standards and criteria for classification (*i.e.*, when disclosure of the compiled information would, itself, reveal classified information or cause harm to national security).

Counsel to the President, to Devin Nunes, Chairman of HPSCI (Feb. 2, 2018).   HPSCI

thereafter publicly released the Nunes Memo with a cover letter authored by Mr. McGahn

documenting the President's action (which was also noted on the Nunes Memo itself with a

stamp stating "Declassification by order of the President February 2, 2018").   Mr. McGahn's

cover letter made it "clear [that] the Memorandum reflects the judgments of its congressional

authors."  *See id.*

### THE "SCHIFF" MEMO

(17)    The HPSCI Minority drafted a memorandum in response to the Nunes Memo,

often referred to as the "Schiff Memo."   The Schiff Memo also references Steele and his

intelligence reporting.

(18)    Subsequent to Congress's release of the Nunes Memo, the HPSCI Minority

submitted the Schiff Memo to DOJ for a classification review.   The FBI conducted the review

requested by the HPSCI Minority and identified those portions of the Schiff Memo that

contained classified information unaffected by the President's declassification of the Nunes

Memo.[4]

(19)    The FBI did not declassify any additional information during its review of the

Schiff Memo, nor did the HPSCI Minority request any further declassification.   Rather, the FBI

conducted a review to identify what information remained classified in light of the President's

---

[4]    The President's declassification of the Nunes Memo resulted only in the declassification of the classified
information contained in that memorandum.   It did not broadly declassify all information contained in or related to
the Carter Page FISA applications and orders, or contained in or related to Christopher Steele or his intelligence
reporting.

declassification of the Nunes Memo.   The HPSCI Minority redacted those portions of the Schiff Memo that the FBI identified as classified and then released the redacted memorandum.   *See id.*

(20)   The HPSCI Minority did not ask the FBI to opine on the contents, judgments, or opinions reflected in the Schiff Memo, and the FBI did not do so.   As with the Nunes Memo, the Schiff Memo represents the judgments of its authors and is not a product of the Executive Branch.

### THE "GRASSLEY/GRAHAM" MEMO[5]

(21)   On January 4, 2018, Senators Grassley and Graham referred to DOJ their allegations that Steele had violated 18 U.S.C. § 1001.   The referral memorandum referenced the Page FISA applications/orders and identified Steele, then a classified intelligence source.   Thus, the memorandum was classified when written.   After the declassification of the Nunes Memo and release of the Nunes and Schiff Memos, the FBI was asked to conduct a classification review of the referral memorandum so that the Senate could publicly release it.   The FBI conducted the classification review and identified portions that remained classified following the declassification of the Nunes Memo, after which the Senate disclosed the memorandum.   As with the Schiff Memo, the FBI was not asked to declassify any additional information and it did not do so.   As with both the Nunes and Schiff Memo, the Grassley/Graham Memo represents the judgments of its authors and is not a product of the Executive Branch.

---

[5]   Neither Plaintiffs nor this Court referenced the Grassley/Graham Memo.   However, it formed part of the body of materials about Steele that the FBI considered in making disclosure decisions about the Page FISA applications, which contain Steele reporting and which thus bears on the FBI's response to Plaintiffs' request.

## FBI'S MODIFIED RESPONSE TO PLAINTIFF'S FOIA REQUEST

### SEARCH

(22)     After withdrawing its Glomar response, the FBI searched for records responsive to Plaintiff's FOIA request, reviewed and redacted as appropriate the responsive records it located, and produced non-exempt portions of responsive records to Plaintiff.

(23)     Initially, in an effort to locate responsive records, FBI employees responsible for handling Plaintiff's FOIA request and litigation contacted employees knowledgeable about the Russian interference investigation, which is the investigation for which the Nunes Memo revealed Steele served as a confidential source.     Based on that consultation and given that Steele was a confidential human source (CHS), the FBI concluded that records of communications, meetings, or conversations between him and the FBI, or payments from the FBI to him or his company, Orbis Business Intelligence, would be located in his CHS file because such records are maintained by the FBI in the relevant CHS file.     Accordingly, the FBI contacted the unit responsible for maintaining CHS files to obtain records responsive to Plaintiff's request.     A copy of Plaintiff's request was provided so that employees searching the CHS file knew which records to search for in terms of substance and date range.[6]     Personnel familiar with CHS files then obtained Steele's file and reviewed it to locate records falling within the scope of Plaintiff's request.     Responsive records were then provided to RIDS for processing under the FOIA.

---

[6]     The FBI used a search cut-off range of January 1, 2016, which was specified by Plaintiff in its request, to May 16, 2017, which was the day on which the FBI originally responded to Plaintiff's request.   (The FBI closed Steele as a CHS in 2016.)

8

(24)    While RIDS typically searches the FBI's Central Records System (CRS) in responding to FOIA requests, it concluded that a separate CRS search in this instance was unnecessary.[7]   Specifically, it concluded that additional searches were not necessary because it was able to obtain responsive records with the assistance of subject matter experts; it concluded that the CHS file that was searched was the location where responsive records would be located and there were no other locations where additional responsive records would be maintained.[8]

## JUSTIFICATIONS FOR NONDISCLOSURE

(25)    As a result of its search efforts, the FBI located and processed 108 pages of responsive records to achieve maximum disclosure consistent with the access provisions of the FOIA.   Every effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable, non-exempt information in the responsive records.   After careful analysis and several layers of review, the FBI provided all reasonably segregable, nonexempt portions of these records to Plaintiff.   In this declaration, the FBI has described the withheld information to the extent possible; further description risks revealing the very information the FBI has concluded is exempt and has accordingly withheld.

(26)    The responsive records in this case have been sequentially Bates-numbered as

---

[7]    The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.   The CRS spans the entire FBI organization and encompasses the records of FBIHQ, FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

[8]    The second and third items in Plaintiff's request referenced records of payments to Orbis Business Intelligence, Steele's company, and meetings or conversations with Orbis employees or representatives.   Steele was the FBI source, so any payments made were made to him and not the company, and interactions were between him and the FBI.   Moreover, the FBI has no way to search for unnamed Orbis employees or representatives. Accordingly, the FBI reasonably limited it search to responsive records regarding/involving Steele.

"1370340-1" through "1370340-108"; for ease of reference, I refer to these as pages 1 through 108.   Next to each redaction block, the FBI has marked the FOIA exemption(s) relied upon to protect information and has identified one or more coded categories corresponding to the nature of the information withheld.   For example, where "(b)(7)(C)-1" appears on a page:

- "(b)(7)(C)" refers to FOIA Exemption (b)(7)(C), which protects against unwarranted invasions of personal privacy; and

- "-1" signals that the information protected falls into the category of "Names/ Identifying Information of FBI Special Agents/Support Personnel."

Taken together, then, the code "(b)(7)(C)-1" next to a redaction means that the FBI protected the identity of one of its employees.

(27)    The following chart identifies each coded category relied upon by the FBI in this case.

| CODED CATEGORIES | INFORMATION WITHELD |
|---|---|
| **EXEMPTION (b)(1)** | **CLASSIFIED INFORMATION** |
| (b)(1)-1 | Intelligence Activity, Source, and Method Information Currently and Properly Classified Pursuant to E.O. 13526 §1.4(c) |
| **EXEMPTION (b)(3)** | **INFORMATION PROTECTED BY STATUTE** |
| (b)(3)-1[9] | National Security Act of 1947, 50 U.S.C. § 3024(i)(1) |
| **EXEMPTIONS (b)(6) & (b)(7)(C)** | **UNWARRANTED INVASIONS OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names/Identifying Information of FBI Special Agents and Professional Staff |
| (b)(6)-2 and (b)(7)(C)-2 | Names/Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-3 and (b)(7)(C)-3 | Names/Identifying Information of Third Parties of |

[9] The FBI originally assigned codes (b)(3)-2 and (b)(3)-3 to information on Bates page 1370340-53.   The redacted information actually falls within coded category (b)(3)-1.

|  | Investigative Interest |
| (b)(6)-4 and (b)(7)(C)-4 | Names/Identifying Information of Non-FBI Federal Government Personnel |
| **EXEMPTION (b)(7)(A)** | **PENDING ENFORCEMENT PROCEEDINGS** |
| (b)(7)(A)-1 | Information Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Enforcement Proceedings |
| **EXEMPTION (b)(7)(D)** | **CONFIDENTIAL SOURCE INFORMATION** |
| (b)(7)(D)-1 | Source Symbol Number for a CHS other than Steele |
| (b)(7)(D)-2[10] | Information Provided by Steele and another Symbol-Numbered Informant |
| **EXEMPTION (b)(7)(E)** | **INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-1 | Identity and/or Location of FBI or Joint Units, Squads, Divisions |
| (b)(7)(E)-2[11] | Confidential Human Source Program Information |
| (b)(7)(E)-4 | Sensitive File Numbers |
| (b)(7)(E)-5 | FBI Intelligence Databases |
| (b)(7)(E)-6 | Collection and/or Analysis of Information |
| (b)(7)(E)-7[12] | Internal FBI Secure Email and Intranet Web Addresses |
| (b)(7)(E)-8 | Investigative Focus of Specific Investigation |

(28)    An index listing each coded category per page is included as **Exhibit C**.

(29)    Of the 108 pages of responsive records located, 14 pages were withheld in full

pursuant to FOIA exemptions, 85 pages were released in part, five pages were released in full,

---

[10] In preparing this declaration, the FBI concluded that information originally protected under coded category (b)(7)(D)-1 pertaining to Christopher Steele should have been protected under (b)(7)(E)-2.   The FBI is no longer relying on Exemption (b)(7)(D) for this information.

Also in preparing this declaration, the FBI concluded that the information protected in coded categories (b)(7)(D)-2, (b)(7)(D)-3, and (b)(7)(D)-4 was substantially similar and that the justification for protecting information in coded category (b)(7)(D)-2 covers all the information.   Thus, the FBI combined these categories and the justification provided for (b)(7)(D)-2 applies to redactions marked with any of these three coded categories.

[11] In preparing this declaration, the FBI concluded that the information protected in coded categories (b)(7)(E)-2, (b)(7)(E)-3, and (b)(7)(E)-9 was substantially similar and that the justification for protecting information in coded category (b)(7)(E)-2 covers all the information.

[12] The FBI is no longer asserting (b)(7)(E)-7 on Bates numbered page 1370340-12. This information is being protected under (b)(6)(b)(7)(C)-1.

11

and four pages were withheld in full as duplicates.

(30)     The responsive records primarily consisted of forms that the FBI uses to manage
and record its interactions with confidential human sources.   All of these records were released
in part, although five individual pages from the forms were released in full.

(31)     Many of these forms have similar information in their headers, including the
name of the FBI agent submitting the form, the field office or division and squad to which that
agent was assigned, the identification number of the relevant confidential source, and the date of
submission.   Below the header, each form contains substantive information appropriate to its
purpose.

(32)     All of the pages released in part or in full were FBI forms relating to the handling
of confidential human sources.   These 90 pages of records consisted of:

a.     14 CHS Reporting Documents (Form FD-1023), which include fields for relevant
information about the report made by the confidential source, including the
substance of the report itself totaling 19 pages, Bates 3–10, 52–62;

b.     13 CHS Contact Reports (Form FD-209a), which include information about the
confidential source contact being reported, and the program to which the contact
is relevant totaling 13 pages, Bates 63–75;

c.     6 Payment Requests (Form-794b) and their associated Payment Receipts, totaling
35 pages, Bates 12–30, 36–51;

i. Payment Requests require a great deal of detailed information about the
individual requesting payment, the individual receiving payment, the
reason that the payment is justified, the program from which payment will

12

be made, and other accounting details associated with the payment;

    ii.  Payment Receipts require information about the confidential source, the paying agent, the witness, and the amount and purpose of the payment;

d.    3 Electronic Communications, and associated enclosures, totaling 11 pages, Bates 78–81, 88–89, 99–103;

e.    1 Human Source Validation Report, totaling 9 pages, Bates 90–98;

f.    1 Import Form, totaling 1 page, Bates 104; and

g.    1 Source Closing Communication (Form FD-1040a), totaling 2 pages, Bates 1–2.

(33)    The 14 pages withheld in full pursuant to FOIA exemptions consisted of two classified email chains, Bates 82–87; five documents related to a particular payment or payments to Christopher Steele, Bates 11, 31–35; and two case agent memos to file, Bates 76–77.   The classified email that appears at Bates 82 through 84 is duplicated at Bates 105 through 108.

## EXEMPTION (b)(1) – CLASSIFIED INFORMATION

(34)    Exemption (b)(1) protects from disclosure records that are:

    (A)    specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

    (B)    are in fact properly classified pursuant to such Executive Order.

5 U.S.C. § 552(b)(1).

(35)    The FBI's analysis of whether Exemption (b)(1) permits the withholding of agency information consists of two significant steps.   The FBI must determine first whether the information contained in the records qualifies for classification under the applicable Executive Order governing classification and protection of national security information, and second whether the information actually has been classified in compliance with the various substantive

13

and procedural criteria of the Executive Order.

(36)    E.O. 13526 presently governs the classification and protection of information that affects the national security (*i.e.*, "the national defense of foreign relations of the United States," § 6.1(cc)), and prescribes the various substantive and procedural criteria for classifying information.   I am bound by the requirements of E.O. 13526 when making classification determinations.

### Substantive and Procedural Requirements of E.O. 13526

(37)    For information to be properly classified, and thus properly withheld pursuant to Exemption (b)(1), the information must meet the substantive requirements set forth in E.O. 13526 § 1.1(a), which requires:

>    (1)    an original classification authority must have classified the information;
>
>    (2)    the information must be owned by, produced by or for, or be under the control of the United States Government;
>
>    (3)    the information must fall within one or more of the categories of information listed in § 1.4 of [the] order; and
>
>    (4)    the original classification authority must determine that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority must be able to identify or describe the damage.

(38)    In addition to these substantive requirements, certain procedural and administrative requirements set forth in E.O. 13526 must be followed before information can be considered to be properly classified, such as proper identification and marking of documents. Specifically, E.O. 13526 requires that:

>    (a)    Each document was marked as required and stamped with the proper classification designation.   *See* E.O. 13526, § 1.6(a)(1) – (5).

14

(b)     Each document was marked to indicate clearly which portions are classified and which portions are exempt from declassification as set forth in E.O. 13526 § 1.5(b).   *See* E.O. 13526, § 1.6(a)(5)(c).

(c)     The prohibitions and limitations on classification specified in E.O. 13526, § 1.7 were followed.

(d)     The declassification policies set forth in E.O. 13526, §§ 3.1 and 3.3 were followed.

(e)     Any reasonably segregable portions of these classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

(39)     With the above requirements in mind, I determined that the information protected pursuant to Exemption (b)(1) in the records responsive to Plaintiff's request is currently and properly classified.   Specifically, this information is owned by, was produced by or for, and is under the control of the U.S. Government; was classified by an original classification authority; meets all of the procedural requirements of E.O. 13526; and warrants classification at the SECRET level to protect "intelligence activities (including covert action), intelligence sources or methods, or cryptology," *see* E.O. 13526, § 1.4(c), because unauthorized disclosure of this information could be expected to cause serious damage to national security.

(40)     I examined the information protected in this case pursuant to Exemption (b)(1) in light of the body of information available to me concerning the national defense and foreign relations of the United States.   This information was not examined in isolation.   Instead, it was evaluated with careful consideration given to the impact that its disclosure could have on other sensitive information contained elsewhere in the United States Intelligence Community's files. Equal consideration was given to the impact that other information – both in the public domain and likely known or suspected by present or potential adversaries of the United States – would

15

have upon the information protected here.

(41)     The justifications for protecting classified information here were prepared with the intent that they be read with consideration given to the context in which the classified information is found.   This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by other hostile intelligence entities.   It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence activities, sources, and methods and foreign relations/activities of the United States could reasonably be expected to harm interests that FOIA exemptions were designed to protect.

*(b)(1) – 1*
*E.O. 13526, § 1.4(c) – Intelligence Activities, Sources and Methods*

## Overview

(42)     E.O. 13526, § 1.4(c) authorizes the classification of "intelligence activities (including covert action), intelligence sources or methods, or cryptology."   An intelligence activity, source, or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization.   An intelligence activity, source, or method has two characteristics.   First, the intelligence activity, source, or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions.   Second, confidentiality must be maintained with respect to the use or non-use of the activity, source, or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, source, and method are to be preserved.

(43)    Intelligence activities, sources, and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness.    Intelligence activities, sources, and methods are valuable only so long as they remain unknown and unsuspected.    Once an intelligence activity, source, or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(44)    Moreover, the U.S. Government must do more than prevent explicit references to intelligence activities, sources, and methods; it must also prevent indirect references to them. One vehicle for gathering information about the U.S. Government's capabilities is by reviewing officially-released information.    We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts.    Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

### Application

(45)    The fact that Steele was a classified intelligence source/CHS was declassified by President Trump when he declassified the Nunes Memo, which was then publicly released by the White House.    Additional public disclosures followed in the Schiff and Grassley/Graham Memos, as well as through FOIA releases by the FBI including the Carter Page FISA applications.    Thus, that Steele was an intelligence source is a publicly known fact.    However,

17

only limited details of his work as an intelligence source for the FBI and the reporting he provided were affected by the declassification of the Nunes Memo and made public through the disclosures of the Congressional memoranda and FOIA releases by the FBI.   The vast majority of Steele's work and reporting as an intelligence source remain classified.

(46)    Accordingly, the FBI withheld information about his intelligence reporting activities other than those that have been declassified and publicly disclosed, including the period of time he served as an intelligence source and information he provided to the FBI.   Disclosure of this information could reasonably be expected to cause serious damage to the national security, as it would:   (a) identify targets of FBI intelligence-gathering activities; (b) reveal actual intelligence activities undertaken by the FBI, including non-public information about particular methods used in doing so, regarding specific targets and during specific periods of time; and (e) reveal the FBI's intelligence priorities and objectives and (e) reveal the FBI's intelligence priorities and objectives.   Armed with such information, adversaries, including hostile foreign governments, could implement actions to thwart the FBI's intelligence activities and weaken or negate the particular intelligence methods, which would severely disrupt the FBI's intelligence-gathering capabilities.

(47)    Within the responsive pages, another CHS, referred to only by their symbol source number, was identified and that source's reporting, which was singular in nature, was summarized.[13]   For the same reasons discussed in the preceding paragraph, disclosure of information that could reasonably be expected to identify another intelligence source could enable adversaries to thwart the FBI's intelligence-gathering mission and efforts by allowing

---

[13]   The source was not Steele, Orbis, or an Orbis employee or representative.

them to target and neutralize the source, or take measures to counter the information that source

may have been able to provide to the FBI.   This, in turn, risks discouraging sources from

assisting the FBI in the future.

(48)    Finally, the FBI protected information about specific intelligence collection

requirements and key intelligence questions that the FBI seeks to answer as part of its overall

intelligence-gathering mission in order to protect the national security of the United States.

Disclosure of this information would reveal particular, singular details about the FBI's

intelligence interests, priorities, activities, and methods at a particular period of time and in

relation to a particular set of circumstances.   Adversaries could use this information to thwart

the FBI's intelligence-gathering mission and efforts.

(49)    For the preceding reasons, the information described above is currently and

properly classified pursuant to E.O. 13526, § 1.4(c) at the SECRET level, and the FBI properly

withheld it under Exemption (b)(1).

## EXEMPTION (b)(3) – INFORMATION EXEMPTED FROM DISCLOSURE BY STATUTE

(50)    Exemption (b)(3) protects information that is specifically exempted from public

disclosure by a statute that :

> (A)(i) requires that the matters be withheld from the public in such
> a manner as to leave no discretion on the issue; or (ii) establishes
> particular criteria for withholding or refers to particular types of
> matters to be withheld; and

> (B) if enacted after the date of enactment of the OPEN FOIA Act
> of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3).

*(b)(3)-1*
***National Security Act of 1947, 50 U.S.C. § 3024(i)(1)***

(51)     The FBI asserted Exemption (b)(3) to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947, as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), 50 U.S.C. § 3024(i)(1), which provides that the Director of National Intelligence ("DNI") "shall protect from unauthorized disclosure intelligence sources and methods."

(52)     As relevant to 5 U.S.C. § 552(b)(3)(B), Section 102A was enacted in 1947, long before the date of enactment of the OPEN FOIA Act of 2009.

(53)     On its face, this federal statute leaves no discretion to agencies regarding withholding of information from the public about intelligence sources and methods.    Thus, the protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(i)(1) is absolute. Moreover, the section draws no distinction between classified and unclassified intelligence sources and methods.    All must be protected pursuant to § 3024(i)(1).

(54)     To fulfill its obligation of protecting intelligence sources and methods, the DNI is authorized to establish and implement guidelines for the Intelligence Community ("IC") for the classification of information under applicable laws, Executive Orders, or other Presidential Directives, and for access to and dissemination of intelligence.    50 U.S.C. §§ 3024(i)(2)(A),(B). Accordingly, the DNI promulgated Intelligence Community Directive 700, providing IC elements shall protect "national intelligence and intelligence sources and methods and activities from unauthorized disclosure."   *See* Intelligence Community Directive (ICD) 700, 7 June 2012, ¶ 2a.   The FBI is one of the member agencies comprising the IC, and as such, must protect intelligence sources and methods.

(55)     Here, the FBI relied on Exemption (b)(3) to protect the same classified sources

20

and methods that it protected under Exemption (b)(1), as described above.    In addition, the FBI

relied on Exemption (b)(3) to protect unclassified intelligence source and method information.

In particular, it protected information about where and when Steele operated as a source for the

FBI and details related to payments to Steele which reveal the specific activities associated with

the payments.[14]   The above-described types of information would reveal non-public information

about how the FBI interacts with intelligence sources and deploys particular intelligence

methods, and thus plainly falls within § 3024(i)(1)'s edict to the DNI to protect the IC's

intelligence sources and methods.

### EXEMPTION (b)(7) – LAW ENFORCEMENT PROTECTIONS

(56)    Exemption (b)(7) protects from mandatory disclosure records or information

compiled for law enforcement purposes under six circumstances.    *See* 5 U.S.C. § 552 (b)(7).

#### *Threshold Requirement*

(57)    Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it

must first demonstrate that the records or information at issue, if they exist, were "compiled for

law enforcement purposes."   5 U.S.C. § 552(b)(7).   Law enforcement agencies such as the FBI

must demonstrate that the records at issue, if any, are related to the enforcement of federal laws

and that the enforcement activity is within the law enforcement duty of that agency.

(58)    Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by

the Attorney General's Guidelines for Domestic FBI Operations, and 28 C.F.R. § 0.85, the FBI is

the primary investigative agency of the federal government and has authority and responsibility

---

[14]   The FBI also relied on Exemption (b)(7)(E) to protect unclassified intelligence sources and methods because these intelligence sources and methods also qualify for protection as law enforcement techniques and procedures.

21

to investigate all violations of federal law not exclusively assigned to another agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of the United States.

(59)    As revealed in the Congressional memoranda discussed above and through production of the Carter Page FISA applications, Steele was an intelligence source for the FBI who provided information relied on as part of the FBI's investigation into Russian interference in the 2016 Presidential election.   On March 20, 2017, then-FBI Director James B. Comey confirmed in public testimony before Congress "that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts."   Statement Before the House Permanent Select Committee on Intelligence, available at https://www.fbi.gov/news/testimony/hpsci-hearing-titled-russian-active-measures-investigation).   He added that "[a]s with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed."   *Id.*

(60)    On May 17, 2017, Deputy Attorney General Rod Rosenstein named former FBI Director Robert S. Mueller, III as Special Counsel.   Under the terms of his appointment, Special Counsel Mueller is authorized to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the

22

scope of 28 C.F.R. § 600.4(a)."   DOJ Order No. 3915-2017, Appointment of Special Counsel to

Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May

17, 2017)).   In addition, "[i]f the Special Counsel believes it necessary and appropriate, the

Special Counsel is authorized to prosecute federal crimes arising from the investigation of these

matters."   *Id.*

(61)     Additionally, the Nunes and Schiff Memos both revealed that Steele was a source

for the FBI prior to him providing the reporting related to FBI's Russian interference

investigation.   The FBI is limited in the amount of information it can provide regarding the

prior relationship; however, information and records from Steele prior to his reporting related to

the Russian interference investigation were compiled by the FBI as part of one or more

investigations pursuant to the FBI's authority to conduct criminal and national security

investigations and to further the foreign intelligence objectives of the United States.

(62)     Accordingly, the FBI has shown that these records satisfy Exemption (b)(7)'s

threshold requirement.

### *Exemption (b)(7)(A) – Pending Enforcement Proceedings*

(63)     FOIA Exemption (b)(7)(A) protects records or information compiled for law

enforcement purposes when disclosure "could reasonably be expected to interfere with

enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).   In addition to satisfying Exemption

(b)(7)'s threshold, an agency must establish (a) a pending or prospective law enforcement

proceeding that (b) could reasonably be expected to be adversely affected if responsive records

are disclosed.

(64)     Here, the FBI relied on Exemption (b)(7)(A) to protect certain information to

avoid interfering with the pending Russian interference investigation, as well as one or more other investigations about which Steele provided information as a confidential source.

(65)   It is unprecedented that any details about the FBI's interactions with a confidential source would be disclosed while an investigation is active and pending.   However, here, is has been disclosed that Steele was a confidential human source for the FBI and that some information he provided was relied on in at least one aspect of the Russian interference investigation – *i.e.*, as revealed in the Carter Page FISA applications.

(66)   Nevertheless, there are portions of and details about his reporting to the FBI within the responsive records that have not previously been publicly revealed that could reasonably be expected to interfere with the pending Russian interference investigation if disclosed.   In particular, the records contain information considered during certain stages of the FBI's Russian interference investigation, which remains ongoing.   The release of non-public investigative material, efforts, or avenues from any stage of an investigation could enable subjects and witnesses to conclude what has or has not been investigated and the status, scope, and/or focus of the ongoing investigation.

(67)   Moreover, the Congressional memoranda revealed that Steele had been a source for the FBI prior to his reporting that was relied upon by the FBI in the Russian interference investigation.   The scope and focus of his prior assistance to the FBI has not been publicly disclosed (and aspects of it remain classified).   In particular, it has not been disclosed for how many investigations he provided reporting; the scope, focus, and nature of the investigation(s) for which he reported; or any other details about the subject matter of his reporting.   However, there is at least one other investigation about which Steele provided reporting that remains

24

pending.

(68)    In relation to the other pending investigation(s), the FBI redacted information

related to payments to Steele, such as the amount and activities for which such compensation

was sought or made; about where and when Steele was operating and the FBI interacted with

him; and pending file number(s) and subject matter(s).

(69)    While decisions were made that some information about Steele should be

disclosed in the public interest, no such decision has been made about all information regarding

Steele and his informant activities for the FBI.    Prematurely disclosing this information here

would give targets and others intent on interfering with the FBI's investigative efforts the

information necessary to: take defensive actions to conceal criminal activities; develop and

implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and

identify potential witnesses or sources, exposing them to harassment, intimidation, coercion,

and/or physical threats.    Thus, the FBI protected other reporting made by Steele related to one

or more pending investigations; when and where the FBI interacted with him while he served as

a confidential human source; and the file number(s) and subject matter(s) of the pending

investigation(s).

(70)    The FBI also protected payment information because disclosure of such

information, especially without adequate context, could be viewed to suggest the relative volume

or importance of information provided by Steele as a source in the previously undisclosed

investigation(s).    This is information that the subject(s) of such investigation(s) could use to

assess the likelihood that particular activities have come to the FBI's attention and then take

countermeasures, destroy or fabricate evidence, or otherwise act in a way to thwart the FBI's

intelligence gathering and/or investigative efforts.

(71)     The FBI is relying on FOIA Exemption (b)(7)(A) to not only prevent interference with the ongoing investigation(s), but to avoid disruption to any potential prosecutions that could arise from the investigation(s).

(72)     For the reasons described above, the FBI withheld information that could reasonably be expected to interfere with the pending investigation(s) and any potential resulting prosecutions pursuant to FOIA Exemption (b)(7)(A).

### *Exemptions (b)(6) & (b)(7)(C) – Unwarranted Invasions of Privacy*

(73)     Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(6).   All information that applies to a particular person falls within the scope of Exemption (b)(6).

(74)     Exemption (b)(7)(C) similarly exempts from disclosure records or information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."   5 USC § 552 (b)(7)(C).

(75)     The FBI conjunctively asserts Exemptions (b)(6) and (b)(7)(C) because they provide overlapping protections for personal privacy.   Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.   Each exemption balances individuals' privacy interests against the public's interest in disclosure.   Finally,

26

information qualifying for protection under Exemption (b)(7)(C)'s balancing of private and public interests will necessarily qualify for protection under Exemption (b)(6).

(76)    For purposes of both exemptions, a public interest exists only when information about an individual would significantly increase the public's understanding of the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.

(77)    In applying these exemptions, the FBI first determined the nature and strength of the privacy interest of every individual whose privacy interests were implicated in the records. After determining that an individual had a cognizable privacy interest, the FBI then determined whether there was a public interest in disclosure of that individual's identity.    If a public interest existed, the FBI then balanced the privacy and public interests.    If no public interest existed, then no balancing was required as the privacy interests would necessarily prevail.

### (b)(6)/(b)(7)(C)-1        FBI Special Agents and Professional Staff

(78)    The FBI protected the names, singular job titles by themselves or in conjunction with other information that could readily identify an FBI employee,[15]  email addresses, Unique Employee Identifiers ("UEIDs"),[16]  and telephone numbers of FBI Special Agents ("SAs") and Professional Staff.

---

[15] For example, a job title combined with a particular location that readily identify a particular employee.

[16] The UEID is a unique identifier assigned to every Federal employee.   The UEID was implemented to replace use of a social security number for the data management operations in the Federal community.

27

(79)   The FBI considers that its employees – whether Special Agents or Professional Staff – enjoy substantial privacy protections by virtue of their FBI employment because, whether they are involved in investigating cases or providing other types of services and support, their employment can subject them to harassment, as well as unnecessary, unofficial questioning as to the conduct of agency business.

(80)   FBI Special Agents and Professional Staff employees have access to information regarding official law enforcement investigations, and therefore may become targets of harassing inquires for unauthorized access to information regarding such investigations if their identities were released.   Assignments of Special Agents and Professional Staff employees to any particular matter or investigation are not by choice.   Publicity (adverse or otherwise) regarding a specific investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations.   Special Agents and Professional Staff employees also have privacy interests in being protected from unnecessary, unofficial questioning as to their conduct and performance of their jobs in particular investigations, whether or not they are currently employed by the FBI.   For example, an individual targeted by such law enforcement actions may carry a grudge and may seek revenge on the involved employees.

(81)   Many of these concerns are heightened when the employees whose identities are protected work on counterintelligence cases.   The FBI's counterintelligence mission involves protecting the secrets of the U.S. Intelligence Community from risks of espionage and insider threats; protecting the nation's critical assets; and countering the activities of foreign spies. FBI counterintelligence investigations involve significant threats to the national security of the United States by foreign intelligence services and other hostile government actors.   Special

Agents and Professional Staff employees who work these investigations can be exposed to real and substantial threats to their lives and safety, and the FBI's concerns about targets of such investigations holding grudges against these employees are more acute when those targets are foreign intelligence officers from hostile governments.

(82)     For the reasons above, therefore, the FBI has concluded that its Special Agents and Professional Staff employees mentioned in these records have substantial privacy interests.

(83)     In contrast, there is no public interest to be served by disclosing these employees' identities because they would not, by themselves, significantly increase the public's understanding of the FBI's operations and activities here.[17]

(84)     Thus, in the absence of a public interest, these employees' privacy interests necessarily prevail and the FBI properly protected their identities pursuant to Exemptions (b)(6) and (b)(7)(C).

**(b)(6)/(b)(7)(C)-2:**          **Third Parties Merely Mentioned**

(85)     The FBI also protected the identities of third party individuals who were merely mentioned in records responsive to Plaintiff's request.[18]   These individuals are referenced in FBI files because they were merely mentioned by FBI employees when they memorialized FBI investigative efforts and activities.   These individuals were not of investigative interest to the FBI; they were not targets or witnesses in the investigation(s) referenced in the responsive records.   These individuals maintain substantial and legitimate privacy interests in not having

---

[17]   The FBI protect the names and identifying information of non-executive level employees – *i.e.*, employees at the GS-15 level and below.
[18]   Identifying information is any information that could be used to identify a particular individual by itself or in connection with other information such as, such as social security number, date and/or place of birth, singular job titles, etc.

29

their identities disclosed in connection with FBI investigative and intelligence-gathering

activities because such a connection could arouse negative or derogatory inferences, subject

them to harassment or criticism, or focus unwarranted suspicion on these individuals.

(86)    In contrast, there is no public interest to be served by disclosing these individuals'

identities because their identities, by themselves, would not significantly increase the public's

understanding of FBI operations and activities.

(87)    Accordingly, the FBI properly protected these individuals' privacy interests

pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

**(b)(6)/(b)(7)(C)-3:**          **Third Parties of Investigative Interest**

(88)    Next, the FBI protected the identities of third party individuals in whom the FBI

has or had investigative interest.    The individuals' whose identities were protected here are

those who have not been publicly identified by the FBI as being of investigative interest.    Being

identified as an individual in whom the FBI has investigative interest in the context of a national

security, counterintelligence, or criminal investigation carries a strong negative connotation and

can be stigmatizing.    Publicly disclosing the identities of these individuals could subject them to

harassment or embarrassment, as well as undue public attention.    Accordingly, the FBI

determined these individuals maintain substantial privacy interests in not having their identities

disclosed here.

(89)    In contrast, these individuals' identities, by themselves, would not significantly

increase the public's understanding of the FBI's performance of its mission.

(90)    Accordingly, the FBI properly withheld this information pursuant to FOIA

Exemptions (b)(6) and (b)(7)(C).

**(b)(6)/(b)(7)(C)-4:**        **Non-FBI Federal Government Personnel**

(91)     Finally, the FBI protected the names of employees from other Federal agencies

who assisted the FBI in the investigation(s) referenced in the responsive records.    The rationale

for protecting FBI employees' identities as discussed above applies to protecting these

employees' identities.    For those same reasons, these employees maintain substantial privacy

interests in not having their identities disclosed within the context of the responsive records.

(92)     And as with FBI employee's identities, there is no public interest to be served by

disclosing these employee's identities because by themselves, these employees' identities would

not significantly increase public understanding of FBI operations and activities.

(93)     Accordingly, the FBI properly protected withheld this information pursuant to

FOIA Exemptions (b)(6) and (b)(7)(C).

*Exemption (b)(7)(D) – Confidential Source Information*

(94)     Exemption (b)(7)(D) protects records or information compiled for law

enforcement purposes when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a state, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement authority in the course of
> a criminal investigation or by an agency conducting a lawful
> national security intelligence investigation, information furnished
> by a confidential source.

5 U.S.C. § 552(b)(7)(D).   Exemption (b)(7)(D) provides categorical protection for the identities

of confidential sources, as well as information provided by such sources in criminal or national

security investigations.   No balancing of interests is required under this exemption and the

public's interest in the information is not a factor.   Rather, once the FBI establishes that the

31

source provided information under express or implied assurances of confidentiality, the identity

of the source and all information the source provided in a criminal or national security

investigation are exempt under Exemption (b)(7)(D).

(95)    The FBI regularly relies on confidential sources, and such sources are one of the

FBI's most important investigative resources.   Confidential sources may provide information

under express assurances of confidentiality, and are "informants" within the common meaning of

the term, although the FBI refers to them as "Confidential Human Sources" or "CHSs."

Alternatively, confidential sources may provide information under circumstances from which

assurances of confidentiality may be inferred.   In either situation, these sources are considered

to be confidential because they furnish information only with the understanding that their

identities and the information they provide will not be divulged by outside the FBI.

Information provided by these sources is generally singular in nature, and if released, could

reveal their identities.   Sources must feel free to furnish information to the FBI with complete

candor and without the understandable tendency to hedge or withhold information because of

fear that their cooperation with the FBI will later be made public and that they may, as a result,

face reprisals.   The FBI has learned through experience that sources must feel secure that their

assistance and their identities will be held in confidence.

(96)    As a result of the declassification of the Nunes Memo and the disclosure of the

Nunes and Schiff Memos, it was publicly revealed that Christopher Steele was a CHS for the

FBI.   Accordingly, the FBI has not protected his identity or that fact here, nor has it protected

information he provided to the FBI that matches information revealed in the Nunes, Schiff, or

Grassley/Graham Memos, or that has been disclosed in the Carter Page FISA applications and

accompanying orders.   Rather, the FBI has protected certain information he provided in relation

to the Russian interference and other pending investigation(s) referenced in the responsive

records that has not already been made public through an authorized public disclosure by DOJ or

the FBI.

**(b)(7)(D)-1:   <u>Confidential Source Symbol Number</u>**

(97)   On Bates page 93, the FBI protected the permanent source symbol number of a

confidential source.[19]   The FBI assigns permanent source symbol numbers in sequential order to

CHSs who report information to the FBI on a regular basis pursuant to an express assurance of

confidentiality.   In this case, the FBI did not refer to the confidential source by his or her true

name.   Instead, the source was referred to only by his or her individually assigned permanent

source symbol number, which is unique to the CHS.   The FBI obtained information from this

confidential source in the course of conducting activities within the FBI's law enforcement

and/or intelligence-gathering missions.

(98)   If the FBI disclosed the confidential source symbol number of this source, his or

her identity could be ascertained by persons knowledgeable of the FBI's

investigations/intelligence-gathering activities referenced in the records responsive to Plaintiff's

request.   Furthermore, if the FBI disclosed his or her identity, the CHS, as well as his or her

family, could be subjected to embarrassment, humiliation, and/or physical or mental harm.

Disclosure of a source symbol number at various times and in various documents could identify

a CHS because such disclosure would reveal the connections of the source to the subject matter

---

[19]   The source was not Steele, Orbis, or an Orbis employee or representative.   This information is also
classified and was discussed in relation to the FBI's Exemption (b)(1) withholdings previously in this declaration.

of these documents.   Repeated release of the confidential source symbol number along with the information provided by the confidential source would narrow the possibilities of his or her true identity.   This is especially true inasmuch as each confidential source symbol number is assigned to only one CHS.

(99)   Moreover, the disclosure of a CHS's identity would have a chilling effect on the activities and cooperation of other FBI confidential sources.   The FBI has found that it is only with the understanding of complete confidentiality that the aid of such sources can be enlisted, and only through this confidence that sources can be persuaded to continue providing valuable assistance in the future.   Accordingly, the FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(D).

**(b)(7)(D)-2:**   **Information Provided by CHSs**

(100)   Steele was a symbol-numbered, code-named CHS for the FBI.   By definition, such sources are confidential.   That is, as part of the FBI's protocols for CHSs, they are provided express assurances of confidentiality.   Moreover, Steele provided information in relation to the Russian interference investigation, which is a national security investigation, and the other criminal/national security investigation(s) revealed in the responsive records. Accordingly, under the second clause of Exemption (b)(7)(D), any information he provided is categorically exempt.   Thus, except as to information that matches information in the Nunes, Schiff, and Grassley/Graham Memos, and information that DOJ and the FBI officially publicly disclosed in the Carter Page FISA applications and resulting orders, all other information that Steele has provided to the FBI remains exempt under the categorical protection of the second clause of Exemption (b)(7)(D).   Accordingly, the FBI properly withheld this information.

34

(101)   Finally, the FBI also protected information provided to it by the confidential symbol-numbered source referenced in relation to coded category (b)(7)(D)-1 above.   By definition, such sources are confidential because as part of the FBI's protocols for CHSs, they are provided express assurances of confidentiality.   Also, as previously mentioned, this source The FBI obtained information from this confidential source in the course of conducting activities within the FBI's law enforcement and/or intelligence-gathering missions.   Accordingly, any information provided by this source is categorically exempt under the second clause of Exemption (b)(7)(D).

### *Exemption (b)(7)(E) – Investigative Techniques and Procedures*

(102)   Exemption (b)(7)(E) protects records or information compiled for law enforcement purposes when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."   5 U.S.C. § 552 (b)(7)(E).   This exemption affords categorical protection to techniques and procedures used in law enforcement investigations.   It protects techniques and procedures that are not well-known to the public as well as non-public details about the use of publicly-known techniques and procedures.

### (b)(7)(E)-1:   Identity and/or Location of FBI or Joint Units, Squads, Divisions

(103)   The FBI protected the location and identity of FBI units and/or joint units that were involved in/responsible for conducting the investigation(s) referenced in the responsive records, to the extent not already made public.   Disclosure of the location of the units conducting the investigation(s) would reveal the targets, the physical areas of interest of the

investigation(s), and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not.   If the locations are clusters in a particular area, it would allow hostile actors to avoid or circumvent those locations, especially if one or more location appeared with frequency or in a pattern.   This would disrupt the method of the investigative process and deprive the FBI of valuable information.

(104)   The withholding of the units involved is justifiable as well under a similar rationale.   Once identified, the unit's areas of expertise becomes known and an individual would then be aware of exactly what the law enforcement agency's interest is in the record at issue.   For example, knowing that a unit whose focus is on financial crimes is involved is quite different information than knowing that the unit involved has a focus on crimes of violence. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or to avoid altogether activities in a particular location.   The revelation of the involvement that one or more units of differing focuses is critical information that can allow the adjustment of behaviors and activities to avoid detection.

(105)   For these reasons, the FBI protected this information pursuant to Exemption 7(E).

**(b)(7)(E)-2:   CHS Program Information**

(106)   The FBI protected the non-public information about its CHS program, including techniques and procedures used in the operation of the program.   CHSs are an integral and crucial resource for the FBI in carrying out its law enforcement, national security, and intelligence gathering missions.   In order for the FBI to successfully fulfill these missions, it is essential for its CHS program to operate effectively, and in order for that to occur, non-public and sensitive program details must not be publicly disseminated.

36

(107)   Under the FBI's investigative and intelligence gathering authorities, it has

implemented policies for utilizing CHSs by FBI personnel.    These policies establish

standardized procedures for CHS recruitment and use in the course of carrying out the FBI's

mission to interdict crime, prevent terrorism, investigate violations of federal laws, and gather

intelligence on national security threats.    The standardization of procedures for operating the

CHS program ensure that employees utilize this critical technique effectively, ethically, and

within the parameters of federal law and DOJ guidelines.

(108)   The following types of information about the FBI's CHS program were protected

here:

a.    **Operational Directives and Strategies for Recruitment and Utilization**

**of CHSs.**    Information withheld under this category includes operational directives describing

FBI procedures, techniques, and strategies for recruitment and utilization of CHSs, and

instructions about the proper implementation of these procedures, techniques, and strategies.[20]

Disclosure of this information would provide insight to adversaries about the standards followed

by the FBI when relying on CHSs, including the standards that govern techniques and strategies

for recruiting and operation of CHSs.    For example, disclosure would reveal how CHSs are

recruited, trained, and paid, and how they communicate with their FBI handlers.    Criminals,

adversaries, and other hostile actors would learn factors and criteria that would permit them to

identify CHSs; predict individuals who the FBI may approach to be CHSs and other FBI

investigative actions related to CHS operations; and modify their behavior to avoid detection or

---

[20] Overall, these directives and strategies for recruitment and utilization of CHSs are generalized across the FBI's CHS program.

to disrupt the FBI's CHS procedures, techniques, and strategies.   These operational directives

consolidate diverse sources of information, making them even more valuable to adversaries;

while such adversaries may lack the capacity to gather discrete pieces of information to form a

picture of the FBI's strategies, release of the information protected here would do the work for

them.   In sum, disclosure of these operational directives, and information related to the

strategies they govern, would reveal key pieces of FBI CHS program strategies and risk

criminals and other adversaries developing countermeasures to circumvent or impede the FBI's

use of CHS techniques and procedures.   This, in turn, risks impeding the FBI's ability to

interdict and investigate crimes and to gather intelligence critical to protecting national security.

    b. **Approval Limitations on Utilizing CHSs.**   The FBI has created limits

on recruiting and utilizing CHSs and has established requirements for varying degrees of

approval to ensure that the use of these techniques and procedures receive the appropriate level

of oversight.   The approval limitations protected here describe circumstances under which an

individual may or may not be used as a CHS, and limitations on the manner in which CHSs may

be used in particular circumstances. They also describe when a certain level of approval is

required in order to recruit or use a CHS.   Approval limitations ensure FBI employees properly

implement techniques and procedures for recruiting and using CHSs, and further that the FBI's

CHS program is effective, ethical, and consistent with federal law and DOJ guidelines.   These

internal investigative limitations have not been released to the public and if disclosed, would

reveal details of the program that could be exploited in an effort to undermine or impede the

FBI's CHS program.   For example, if adversaries know when and under what circumstances

particular CHS activities are permitted only with a certain level of authorization, and if

information is disclosed revealing that such level of authorization has or had not been obtained, they would be able to predict use of that particular activity and modify their conduct as necessary to avoid detection.    Accordingly, publicly disclosing information that could be used to undermine or impede the FBI's use of this critical investigative and intelligence-gathering technique risks circumvention of the law and threats to national security by adversaries.

c.    <strong><u>Funding and Compensation Procedures and Requirements.</u></strong>

Revealing this category of information would reveal the spending limits for employing sources, spending accounts utilized, the transmission methods for making payments, specific amounts paid to CHSs, and would reveal the FBI's strategies and techniques of effectively using its limited resources in this manner.    In order to fund CHS operations, the FBI has developed specific techniques and procedures that enable it to pay CHSs for their assistance or to reimburse them for expenses incurred related to their efforts.    Since the FBI must operate CHSs covertly in order to conduct successful investigations and intelligence gathering efforts, maintaining operational security requires protection of the techniques and procedures related to CHS financial issues.    Disclosing the amount of money the FBI paid, contemplating paying, or even decided not to pay in relation implementing particular investigative activities or to reimburse for the same would reveal non-public information about the level of resources devoted to particular targets or subject matters, or to particular techniques.    The FBI has limited resources that it must allocate strategically in order to effectively pursue its investigative and intelligence gathering missions.    Revealing the amount and reasons for compensating a particular CHS at or over particular periods of time would reveal the FBI's level of focus on certain investigative or intelligence gathering efforts, and in turn, how the FBI has allocated and is allocating its limited

39

resources.   If aggregated over time, this information would paint a high-level picture of the

resources devoted to particular threat areas, and reveal where the FBI's strengths and weaknesses

may lie across the spectrum of its investigative and intelligence gathering activities.   This

would give sophisticated adversaries and hostile governments the information necessary to adjust

their activities in accordance with the FBI's perceived priorities, in order to avoid the FBI's

strength areas and exploit its weak ones.

      d.    **Source Recruitment and Maintenance Techniques.**   The FBI also

protected information about strategies and techniques for recruiting and maintaining effective

CHSs.   Disclosure of this information would, for example, reveal how FBI Special Agents

identify potential sources during or in relation to a particular investigation, how a source is vetted

for reliability, how the information provided by a source is assessed for accuracy, and how/where

information documenting all of this must be maintained and indexed.   Knowledge of this

information would allow criminals and other adversaries to predict the FBI's CHS recruitment

strategies and which individuals in their spheres are likely recruitment targets.   Armed with

such knowledge, they could intimidate, threaten, or harm potential (or suspected) sources to

prevent them from providing information to the FBI, or even force them to provide false

information to the FBI to mislead and impede investigative and intelligence gathering efforts.

The information protected here also reflects when and how the FBI contacts and interacts with its

CHSs; disclosure would allow criminals and adversaries the chance expose CHSs and

intercept/prevent CHS from interacting with their FBI handlers, thus depriving the FBI of critical

CHS-derived intelligence and information.

      e.    **Source Symbol Source Numbers and Steele's Codename.**   A source

code name is unique and assigned solely to a particular CHS.   Code names are used in lieu of

the actual name of the source.   Likewise, symbol source numbers are unique, singular numbers

assigned to particular FBI CHSs, and used in place of the CHSs' actual names in FBI

communications.   Though Christopher Steele has been publicly confirmed as a former FBI

CHS, his symbol source number and codename have never been officially publically

acknowledged.   Public disclosure of these unique identifiers still presents a law enforcement

circumvention risk as it would provide adversaries the means of tracking and discovering non-

public, sensitive details concerning the FBI's use of information provided by Steele in its pursuit

of investigative and counterintelligence activities.   This would allow adversaries to judge the

utility of such information to the FBI and lay bare key information about the FBI's investigative

and intelligence-gathering strategies for utilizing this information in any other investigations.

Release of this information would allow adveraries to gain knowledge about FBI investigative

and intelligence-gathering strategies, predict future investigative actions, and take steps to avoid

detection and/or disruption by FBI investigative and intelligence-gathering efforts.

(109)   For the reasons described above, the FBI protected detailed information about its

CHS program under Exemption (b)(7)(E) to ensure the continued utility of this critical law

enforcement technique and to prevent circumvention of the law.


**(b)(7)(E)-4:**   **Sensitive File Numbers**

(110)   The FBI protected sensitive case file numbers, including a file number associated

with the FBI's Russian interference investigation and at least one other file number associated

with other reporting activities by Steele.   The file numbers protected here have not been

previously publicly disclosed.   Release of these file numbering conventions identifies the type
of investigation (including nature of the criminal activity or national security threat being
investigated), the priority of the investigation, and the location of the investigation.   Applying a
mosaic analysis, criminals and adversaries could use these numbers (indicative of investigative
priority), in conjunction with other information known about other individuals and/or techniques,
to predict FBI investigative activities and interest in particular locales.   Based on these
predictions, criminals could change their pattern of activity to avoid detection, apprehension, or
create alibis for suspected activities, and adversaries/others intent on impeding the FBI could
take steps to interfere with investigative activities.   Exacerbating this harm, releasing these file
numbers provides criminals and adversaries with a tracking mechanism by which they can place
particular files/investigations within the context of larger FBI investigative efforts.   Release of
sensitive investigative file numbers over time in response to FOIA or other information requests
would allow criminals and adversaries to piece together how FBI investigations may be
interrelated and when, why, and how the FBI pursued different investigative targets and
strategies.   They could then judge where the FBI allocates its limited investigative resources
and/or is prioritizing its intelligence-gathering efforts regarding particular threat areas; how the
FBI responds to different investigative circumstances and national security threats; and what the
FBI likely knows about a particular crime or threat, when/how it obtained that knowledge, and if
there are knowledge-gaps.   Given this data, criminals and adversaries would have sufficient
information to structure their behavior to avoid detection and disruption by the FBI, enabling
them to circumvent the law.   Thus, the FBI properly protected this information from disclosure
pursuant to Exemption (b)(7)(E).

**(b)(7)(E)-5:   FBI Intelligence Databases**

(111)   In Category (b)(7)(E)-5, the FBI protected internal FBI databases used to collect and disseminate critical intelligence for both criminal and national security investigations. Revealing how the FBI used these databases within the CHS-related records subject to Plaintiff's request would reveal information about the capabilities of these particular databases; how and when the FBI queries them to pursue informant operations and/or foreign intelligence gathering; and the types of information gathered from informants the FBI deems most valuable and worthy of memorializing within these systems, and thus the FBI's CHS intelligence gathering priorities. Release of this information would enable hostile adversaries to determine what types of intelligence are most integral to the FBI's investigative efforts, and how they might structure their activities to deprive the FBI of critical intelligence needed to further its criminal and national security investigations.   Additionally, release would allow criminals to judge the FBI's ability to track and disseminate intelligence and allow them to predict the nature of FBI's investigative response when it receives particular pieces of intelligence.   Furthermore, many of the functions in some of these databases are directly tied to CHS recruitment and management techniques.   Releasing information concerning how these databases serve CHS recruitment and management functions would reveal to hostile adversaries a prime target for cyber intrusion should they wish to discover specific information concerning FBI CHS and/or disrupt FBI CHS operations.   Considering the risks of law enforcement circumvention associated with the release of this information within the records at issues, the FBI withheld this information pursuant to FOIA Exemption (b)(7)(E).

**(b)(7)(E)-6:   Collection/Analysis of Information**

(112)   Next, the FBI protected the techniques and procedures its uses to collect and analyze information in connection with both criminal and national security investigations. Release of this information would disclose the identity of methods used in collecting and analyzing information, including how and from where the FBI collects information, and the methodologies employed to analyze it.   Such disclosures would enable criminals and other adversaries to circumvent similar and currently used techniques by highlighting the types of activities, facts, or occurrences that are of particular interest to the FBI in both criminal and national security investigations.   Publicly disclosing this information would inform criminals and adversaries about the kinds of information the FBI is interested in capturing and would afford them the opportunity to employ countermeasures to avoid providing the FBI key investigative evidence or intelligence.   Additionally, revealing how the FBI will respond when it obtains certain investigative information would allow criminals to predict and subsequently subvert FBI investigative efforts.   Accordingly, the FBI properly withheld this information pursuant to FOIA Exemption (b)(7)(E).

### (b)(7)(E)-7:   Internal FBI Secure Email and Intranet Web Addresses

(113)   The FBI has protected internal secure e-mail and intranet web addresses. Releasing this information would provide criminals and other hostile actors with specific targets for possible cyber-attacks.   Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possibly they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data,

44

interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications.   Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law.   Accordingly, the FBI properly asserted Exemption (b)(7)(E) to protect this type of information.

**(b)(7)(E)-8:     Investigative Focus of Specific Investigation**

(114)   Finally, the FBI has relied on Exemption (b)(7)(E) to protect information about the investigative focus of the specific FBI investigation(s) for which Steele served as a CHS. Revealing the focus of an investigation (*i.e.*, what and who is being or has been investigated at a particular point in time) could be correlated to other public information to reveal the scope of FBI programs and strategies as to preventing/disrupting particular types of criminal activities or national security threats.   Release of this type of information would allow criminals and adversaries to gauge the FBI's strengths and weakness within certain threat areas and structure their activities in a manner that avoids detection and disruption by the FBI.   For example, if criminals or adversaries knew that the FBI was devoting investigative resources to a particular type of criminal activity in a specific geographic area and during a specific time period, they would be able to discern that their association with particular activities in that geographic area may cause them to attract the FBI's attention.   They may then cease their activities and take efforts to conceal them to avoid detection, thus circumventing the FBI's law enforcement efforts. Accordingly, the FBI protected this information pursuant to Exemption (b)(7)(E).

## SEGREGABILITY

(115)   The FBI provided Plaintiff all non-exempt records or portions of records

responsive to its FOIA request.   During the processing of Plaintiff's request, each responsive page was individually examined to identify non-exempt information that could be reasonably segregated and released.   All reasonably segregable information has been released to Plaintiff. Once all exempt information was redacted, the only remaining information was either inextricably intertwined with exempt information such that it could not reasonably be segregated without risking revelation of exempt information, or consisted of nothing by words or phrases with no informational content such that an effort to release such meaningless information would not be reasonable.

(116)   In total, the FBI identified 108 pages of records responsive to Plaintiff's request. Five of these pages were released in full, 85 pages were released in part, and 18 pages were withheld in full.

(117)   **Pages Released in Part**.   These pages are comprised of a mixture of material that could be segregated for release and material that was withheld because release would trigger foreseeable harm to one or more interests protected by the cited FOIPA exemptions on these pages.   All information in the redacted portions was either exempt itself, was so intertwined with non-exempt information that segregation of the non-exempt information was not reasonably possible without revealing exempt information, or if segregated would result in nothing by meaningless words or phrases such that it would not be reasonable to expend resources to release it.

(118)   **Pages Withheld in Full**.   A total of 18 pages were withheld in full.   Of these, 4 pages were withheld because they were duplicates of other pages that had been processed for release.   The remaining 14 pages were withheld in full pursuant to one or more FOIA

46

exemptions.   Once all applicable FOIA exemptions were applied to these pages, nothing

remained that could be reasonably segregated for release because all information on these pages

was either exempt itself, was so intertwined with non-exempt information that segregation of the

non-exempt information was not reasonably possible without revealing exempt information, or if

segregated would result in nothing by meaningless words or phrases such that it would not be

reasonable to expend resources to release it.

## CONCLUSION

(119)   The FBI conducted searches reasonably calculated to locate records responsive to

Plaintiff's request and subject to the FOIA, and in fact located records responsive to Plaintiff's

request.   The FBI closely reviewed those responsive records under the access provisions of the

FOIA to achieve maximum disclosure and properly withheld exempt information pursuant to

FOIA Exemptions (b)(1), (b)(3), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D) and (b)(7)(E).   The FBI

carefully examined the documents and determined that the information withheld from Plaintiff in

this case, if disclosed would reveal classified and statutorily-protected information; would

unwarrantedly invade the personal privacy of FBI and other Federal government employees and

various third parties; could reasonably be expected to disclose the information provided by a

confidential source; and/or would reveal non-public information about law enforcement

techniques or procedures.   After several extensive reviews of the documents at issue, I have

determined that there is no further non-exempt information that can be reasonably segregated

and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through C attached hereto are true and correct copies.

Executed this $\underline{15^{th}}$ day of March 2019.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

48