# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
JUDICIAL WATCH, INC.,                 )
                                      )
                   Plaintiff,         )
                                      )
        v.                            )        Case No. 1:17-cv-00916 (CRC)
                                      )
U.S. DEPARTMENT OF JUSTICE,           )
                                      )
                   Defendant.         )
_____)

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
### IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Judicial Watch, Inc., by counsel and pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, respectfully submits this memorandum of points and authorities in opposition to the Motion for Summary Judgment of Defendant U.S. Department of Justice (and its component the Federal Bureau of Investigation ("FBI")) and in support of Plaintiff's Cross-Motion for Summary Judgment.  As grounds thereof, Plaintiff states as follows:

**I.      Factual Background.**

Plaintiff does not dispute Defendant's recitation of the procedural and factual background of this case.  *See* Defendant's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Def's Mem.") at 2-4.

**II.     Legal Standard.**

In the FOIA context, a district court reviewing a motion for summary judgment conducts a *de novo* review of the record, and the responding federal agency bears the burden of proving that it has complied with its obligations under FOIA.  *See* 5 U.S.C. § 552(a)(4)(B); *see also In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008).  The court

must analyze all underlying facts and inferences in the light most favorable to the FOIA

requester, *see Willis v. U.S. Dep't of Justice*, 581 F. Supp. 2d 57, 65 (D.D.C. 2008).

### III.      The FBI Has Not Demonstrated It Conducted an Adequate Search.

To conduct an adequate search, the agency must make a "a good faith effort to conduct a

search for the requested records, using methods which can be reasonably expected to produce the

information requested," and it "cannot limit its search to only one record system if there are

others that are likely to turn up the information requested." *Oglesby v. Dep't of the Army*, 920

F.2d 57, 68 (D.C. Cir. 1990).

"An agency fulfills its obligations under FOIA if it can demonstrate beyond material

doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia

Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897

4 F.2d 540, 542 (D.C. Cir. 1990)); *see also Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994).

The adequacy of an agency's search for documents under FOIA "is judged by a standard of

reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg v. DOJ*,

745 F.2d 1476, 1485 (D.C. Cir. 1984).

Based on the declaration of David Hardy submitted in support of Defendant's summary

judgment motion, the FBI's search was inadequate. *See generally* Second Declaration of David

Hardy ("2d Hardy Decl.") (ECF No. 34).  Paragraph 24 of the declaration states that the agency

limited the scope of its search to the FBI's Confidential Human Source ("CHS") system.

Plaintiff's request, however, was not limited to that time period, instead seeking records from

January 1, 2016 to March 8, 2017.  Def's Mem. at 2.  As such, the search was unnecessarily

narrow.  This is important for two reasons.

First, the FBI's search was not sufficiently broad to locate records regarding FBI's relationship with Steele from before he was signed up as an official, "on-the-books" confidential source.  Presumably, a variety of communications would occur between the FBI and a potential CHS prior to be formally retained as a CHS.  None on these contacts would have been captured by the FBI's search.

In addition, by limiting the scope of the search to the CHS system, responsive records from the period after Steele was deactivated as a confidential source also would not have located. It has been publicly acknowledged that Steele continued to provide information to the FBI via Bruce Ohr even after his deactivation.  *See* Exh. A (Declassified Memorandum from HPSCI Majority Staff ("Nunes Memorandum") at 3 ("Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein.").  Since Steele ceased to be a confidential source in November 2016, the FBI's unnecessarily narrow search would not have located any later communications.

The FBI's search also was inadequate because, even though specifically included in Plaintiff's request, the search did not seek records related to Steele's firm, Orbis Business Intelligence.  Hardy Decl. at 9 fn. 8.  Other than to speculate that communications would have been between only Steele and the FBI, Defendant offers no reason why a key word search on Orbis Business Intelligence could not also have been done.

In short, the FBI's search was inadequate it was unnecessarily narrow.  As a result, Defendant has not demonstrated that it has conducted an appropriate search in response to Plaintiff's FOIA request.  *Oglesby*, 920 F.2d at 68 (requiring search with methods expected to produce the information requested).

**IV.    Defendant Has Not Adequately Demonstrated a Basis for Certain Claims of Exemptions.**

Plaintiff makes two challenges to Defendant's claims of exemptions.  Plaintiff does not challenge the other claims of exemption but notes that additional searches will likely locate additional records.

First, Defendant asserts FOIA exemption 7(A) over various records.  Def's Mem. at 15-17.  FOIA Exemption 7(A) protects from disclosure "records or information" compiled for law enforcement purposes, the production of which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  The exemption applies "whenever the government's case in court—a concrete prospective law enforcement proceeding—would be harmed by the premature release of evidence or information." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978).

In this case, Defendant invoked Exemption 7(A) "to protect certain information to avoid interfering with the pending Russian interference investigation, as well as one or more other investigations about which Steele provided information as a confidential source."  2d Hardy Decl. ¶ 64; Def's MSJ at 15-17.  Now that the Russian interference investigation is complete, Exemption 7(A) is mostly, if not entirely, inapplicable.  While the records withheld under 7(A) were also withheld under other exemptions, Defendant must demonstrate that no part of a partially withheld record cannot be released since there no longer is a "pending Russian interference investigation."

Second, Defendant redacted information relating to payments to Steele also under Exemption 7(A).  Def's Mem. at 17.  Defendant's purported justification is that release of payment information "without adequate context, could be viewed to suggest the relative volume or importance of information provided by Steele as a source in the previously undisclosed

investigation(s)."  *Id.* at 17 (citing 2d Hardy Decl. ¶ 70).  In other words, Defendant is claiming

that it is withholding payment information simply because someone "without adequate context"

may draw an erroneous conclusion.  FOIA does not protect against such "mistakes."

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's

motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

Respectfully submitted,

JUDICIAL WATCH, INC.

/s/  *James F. Peterson*
James F. Peterson
DC Bar No. 450171
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5175
Fax:  (202) 646-5199
Email:  jpeterson@judicialwatch.org

*Counsel for Plaintiff*

May 10, 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                                )
JUDICIAL WATCH, INC.,                         )
                                                                )
                           Plaintiff,               )
                                                                )
              v.                                            )          Case No. 1:17-cv-00916 (CRC)
                                                                )
U.S. DEPARTMENT OF JUSTICE.         )
                                                                )
                           Defendant.             )
_____)


**PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF**
**MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE AND**
**PLAINTIFF'S FURTHER STATEMENT OF MATERIAL FACTS**

Plaintiff, by counsel and pursuant to Local Civil Rule 7.1(h), respectfully submits this

response to Defendants' statement of material facts as to which there is no genuine dispute and

statement of undisputed material facts in support of its cross-motion for summary judgment:

1.      On March 8, 2017, Judicial Watch, Inc. submitted a Freedom of Information Act
request regarding the FBI's relationship with Christopher Steele. See Declaration of David M.
Hardy ("Hardy Decl."), Ex. A ("FOIA Request").

**Response:**

Undisputed.

2.      Judicial Watch requested:
        1. Any and all records of communication between any official,
        employee, or representative of the [FBI] and Mr. Christopher
        Steele, a former British intelligence officer and the owner of the
        private firm Orbis Business Intelligence.
        2. Any and all records regarding, concerning, or related to the
        proposed, planned, or actual payment of any funds to Mr. Steele
        and/or Orbis Business Intelligence.
        3. Any and all records produced in preparation for, during, or
        pursuant to any meetings or telephonic conversations between any
        official, employee, or representative of the [FBI] and Mr.
        Christopher Steele and/or any employee or representative of Orbis

Business Intelligence.
*Id*. at 1.

**Response:**

Undisputed.

3.      The timeframe for the request was January 1, 2016 to "the present."  *Id*.

**Response:**

Undisputed.

4.      On May 16, 2017, the FBI responded to Judicial Watch's FOIA request. Informing the organization that it could "neither confirm nor deny the existence of records responsive to your request."  Id., Ex. C, ECF No. 1.

**Response:**

Undisputed.

5.      Judicial Watch filed suit that same day.  ECF No. 1.

**Response:**

Undisputed.

6.      The FBI moved for summary judgment on the grounds that its Glomar response was justified by FOIA Exemptions 1, 3, 6, 7(A), 7(C), and 7(D), because acknowledging the existence or non-existence of responsive records would cause harms protected by those exemptions.  ECF Nos. 9, 14.

**Response:**

Undisputed.

7.      On February 5, 2018, this Court granted summary judgment to the FBI, finding that "the FBI's Glomar response was proper and Judicial Watch has failed to carry its burden to show public acknowledgment of the requested documents."  ECF No. 19 at 1.

**Response:**

Undisputed.

8.      Judicial Watch moved for reconsideration the following month on the basis of the declassification and release of competing memoranda authored by the Majority and Minority

members of the House Permanent Select Committee on Intelligence, often referred to by the names of the then-Chairman and Ranking Member: i.e., the "Nunes Memo" and the "Schiff Memo."  ECF No. 20.

**Response:**

Undisputed.

9.      In light of these disclosures, the FBI withdrew its Glomar response, see ECF No. 21, and the Court vacated its order and opinion.  Minute Order of March 26, 2018.

**Response:**

Undisputed.

10.      The FBI then searched Steele's confidential human source (CHS) file for responsive records, making an initial production of responsive, non-exempt records on August 3, 2018 and a final production on August 31.  Second Declaration of David M. Hardy, ¶¶ 12, 22-24.

**Response:**

Plaintiff lacks knowledge as to search conducted by the FBI, but does not dispute that productions occurred on the dates set forth above.

11.      Of the 104 pages of responsive, non-duplicative records located, 14 pages were withheld in full, 85 were withheld in part, and five were released in full.  Id. ¶ 29.

**Response:**

Plaintiff lacks knowledge as to the records located but does not dispute that records were withheld as described.

12.      The production was released with detailed markings explaining each withholding.

**Response:**

Undisputed.

13.      These markings were revised and the production re-released on March 14, 2019.

**Response:**

Undisputed.

14.      The production was "sequentially Bates-numbered" from 1370340-1 through 1370340-108.  Id. ¶ 26.

3

**Response:**

Undisputed.

15.     The FBI properly withheld certain information, and some documents in full, pursuant to Exemptions 1, 3, 6, 7(A), 7(c), 7(D), and 7(E).

**Response:**

The statement is a legal conclusion to which no further response is required.

### PLAINTIFF'S FURTHER STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY

1.     Christopher Steele continued to provide information to the FBI via Bruce Ohr even after his deactivation.  *See* Exh. A to Plaintiff's Opp. and Cross Motion (Declassified Memorandum from HPSCI Majority Staff ("Nunes Memorandum") at 3 ("Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein.").

Respectfully submitted,

JUDICIAL WATCH, INC.

/s/  *James F. Peterson*
James F. Peterson
DC Bar No. 450171
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5175
Fax:  (202) 646-5199
Email:  jpeterson@judicialwatch.org

*Counsel for Plaintiff*

May 10, 2019

# EXHIBIT A

# THE WHITE HOUSE

WASHINGTON

February 2, 2018

The Honorable Devin Nunes
Chairman, House Permanent Select Committee on Intelligence
United States Capitol
Washington, DC 20515

Dear Mr. Chairman:

On January 29, 2018, the House Permanent Select Committee on Intelligence (hereinafter "the Committee") voted to disclose publicly a memorandum containing classified information provided to the Committee in connection with its oversight activities (the "Memorandum," which is attached to this letter). As provided by clause 11(g) of Rule X of the House of Representatives, the Committee has forwarded this Memorandum to the President based on its determination that the release of the Memorandum would serve the public interest.

The Constitution vests the President with the authority to protect national security secrets from disclosure. As the Supreme Court has recognized, it is the President's responsibility to classify, declassify, and control access to information bearing on our intelligence sources and methods and national defense. *See, e.g.*, *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). In order to facilitate appropriate congressional oversight, the Executive Branch may entrust classified information to the appropriate committees of Congress, as it has done in connection with the Committee's oversight activities here. The Executive Branch does so on the assumption that the Committee will responsibly protect such classified information, consistent with the laws of the United States.

The Committee has now determined that the release of the Memorandum would be appropriate. The Executive Branch, across Administrations of both parties, has worked to accommodate congressional requests to declassify specific materials in the public interest.[1] However, public release of classified information by unilateral action of the Legislative Branch is extremely rare and raises significant separation of powers concerns. Accordingly, the Committee's request to release the Memorandum is interpreted as a request for declassification pursuant to the President's authority.

The President understands that the protection of our national security represents his highest obligation. Accordingly, he has directed lawyers and national security staff to assess the

---

[1] *See, e.g.*, S. Rept. 114-8 at 12 (Administration of Barack Obama) ("On April 3, 2014 . . . the Committee agreed to send the revised Findings and Conclusions, and the updated Executive Summary of the Committee Study, to the President for declassification and public release."); H. Rept. 107-792 (Administration of George W. Bush) (similar); E.O. 12812 (Administration of George H.W. Bush) (noting Senate resolution requesting that President provide for declassification of certain information via Executive Order).

declassification request, consistent with established standards governing the handling of classified information, including those under Section 3.1(d) of Executive Order 13526. Those standards permit declassification when the public interest in disclosure outweighs any need to protect the information. The White House review process also included input from the Office of the Director of National Intelligence and the Department of Justice. Consistent with this review and these standards, the President has determined that declassification of the Memorandum is appropriate.

Based on this assessment and in light of the significant public interest in the memorandum, the President has authorized the declassification of the Memorandum. To be clear, the Memorandum reflects the judgments of its congressional authors. The President understands that oversight concerning matters related to the Memorandum may be continuing. Though the circumstances leading to the declassification through this process are extraordinary, the Executive Branch stands ready to work with Congress to accommodate oversight requests consistent with applicable standards and processes, including the need to protect intelligence sources and methods.

Sincerely,

Donald F. McGahn II
Counsel to the President

cc: The Honorable Paul Ryan
    Speaker of the House of Representatives

    The Honorable Adam Schiff
    Ranking Member, House Permanent Select Committee on Intelligence

UNCLASSIFIED ~~TOP SECRET//NOFORN~~

January 18, 2018

Declassified by order of the President
February 2, 2018

To:        HPSCI Majority Members

From:      HPSCI Majority Staff

Subject:   Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the
           Federal Bureau of Investigation

## Purpose

This memorandum provides Members an update on significant facts relating to the
Committee's ongoing investigation into the Department of Justice (DOJ) and Federal Bureau of
Investigation (FBI) and their use of the Foreign Intelligence Surveillance Act (FISA) during the
2016 presidential election cycle.  Our findings, which are detailed below, 1) raise concerns with
the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence
Surveillance Court (FISC), and 2) represent a troubling breakdown of legal processes established
to protect the American people from abuses related to the FISA process.

## Investigation Update

On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order
(not under Title VII) authorizing electronic surveillance on Carter Page from the FISC.  Page is a
U.S. citizen who served as a volunteer advisor to the Trump presidential campaign.  Consistent
with requirements under FISA, the application had to be first certified by the Director or Deputy
Director of the FBI.  It then required the approval of the Attorney General, Deputy Attorney
General (DAG), or the Senate-confirmed Assistant Attorney General for the National Security
Division.

The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA
renewals from the FISC.  As required by statute (50 U.S.C. §1805(d)(1)), a FISA order on an
American citizen must be renewed by the FISC every 90 days and each renewal requires a
separate finding of probable cause.  Then-Director James Comey signed three FISA applications
in question on behalf of the FBI, and Deputy Director Andrew McCabe signed one.  Then-DAG
Sally Yates, then-Acting DAG Dana Boente, and DAG Rod Rosenstein each signed one or more
FISA applications on behalf of DOJ.

Due to the sensitive nature of foreign intelligence activity, FISA submissions (including
renewals) before the FISC are classified.  As such, the public's confidence in the integrity of the
FISA process depends on the court's ability to hold the government to the highest standard—
particularly as it relates to surveillance of American citizens.  However, the FISC's rigor in
protecting the rights of Americans, which is reinforced by 90-day renewals of surveillance
orders, is necessarily dependent on the government's production to the court of all material and
relevant facts.  This should include information potentially favorable to the target of the FISA

~~TOP SECRET//NOFORN~~

~~TOP SECRET//NOFORN~~

application that is known by the government.  In the case of Carter Page, the government had at least four independent opportunities before the FISC to accurately provide an accounting of the relevant facts.  However, our findings indicate that, as described below, material and relevant information was omitted.

1) The "dossier" compiled by Christopher Steele (Steele dossier) on behalf of the Democratic National Committee (DNC) and the Hillary Clinton campaign formed an essential part of the Carter Page FISA application.  Steele was a longtime FBI source who was paid over $160,000 by the DNC and Clinton campaign, via the law firm Perkins Coie and research firm Fusion GPS, to obtain derogatory information on Donald Trump's ties to Russia.

   a) Neither the initial application in October 2016, nor any of the renewals, disclose or reference the role of the DNC, Clinton campaign, or any party/campaign in funding Steele's efforts, even though the political origins of the Steele dossier were then known to senior DOJ and FBI officials.

   b) The initial FISA application notes Steele was working for a named U.S. person, but does not name Fusion GPS and principal Glenn Simpson, who was paid by a U.S. law firm (Perkins Coie) representing the DNC (even though it was known by DOJ at the time that political actors were involved with the Steele dossier).  The application does not mention Steele was ultimately working on behalf of—and paid by—the DNC and Clinton campaign, or that the FBI had separately authorized payment to Steele for the same information.

2) The Carter Page FISA application also cited extensively a September 23, 2016, *Yahoo News* article by Michael Isikoff, which focuses on Page's July 2016 trip to Moscow.  <u>This article does not corroborate the Steele dossier because it is derived from information leaked by Steele himself to *Yahoo News*.</u>  The Page FISA application incorrectly assesses that Steele did not directly provide information to *Yahoo News*.  Steele has admitted in British court filings that he met with *Yahoo News*—and several other outlets—in September 2016 at the direction of Fusion GPS.  Perkins Coie was aware of Steele's initial media contacts because they hosted at least one meeting in Washington D.C. in 2016 with Steele and Fusion GPS where this matter was discussed.

   a) Steele was suspended and then terminated as an FBI source for what the FBI defines as the most serious of violations—an unauthorized disclosure to the media of his relationship with the FBI in an October 30, 2016, *Mother Jones* article by David Corn.  Steele should have been terminated for his previous undisclosed contacts with Yahoo and other outlets **in September**—before the Page application was submitted to

# UNCLASSIFIED

TOP SECRET//NOFORN

the FISC in October—but Steele improperly concealed from and lied to the FBI about those contacts.

    b)  Steele's numerous encounters with the media violated the cardinal rule of source handling—maintaining confidentiality—and demonstrated that Steele had become a less than reliable source for the FBI.

3)  Before and after Steele was terminated as a source, he maintained contact with DOJ via then-Associate Deputy Attorney General Bruce Ohr, a senior DOJ official who worked closely with Deputy Attorneys General Yates and later Rosenstein. Shortly after the election, the FBI began interviewing him, documenting his communications with Steele. For example, in September 2016, Steele admitted to Ohr his feelings against then-candidate Trump when Steele said he "**was desperate that Donald Trump not get elected and was passionate about him not being president.**" This clear evidence of Steele's bias was recorded by Ohr at the time and subsequently in official FBI files—but not reflected in any of the Page FISA applications.

    a)  During this same time period, Ohr's wife was employed by Fusion GPS to assist in the cultivation of opposition research on Trump. Ohr later provided the FBI with all of his wife's opposition research, paid for by the DNC and Clinton campaign via Fusion GPS. The Ohrs' relationship with Steele and Fusion GPS was inexplicably concealed from the FISC.

4)  According to the head of the FBI's counterintelligence division, Assistant Director Bill Priestap, corroboration of the Steele dossier was in its "infancy" at the time of the initial Page FISA application. After Steele was terminated, a source validation report conducted by an independent unit within FBI assessed Steele's reporting as only minimally corroborated. Yet, in early January 2017, Director Comey briefed President-elect Trump on a summary of the Steele dossier, even though it was—according to his June 2017 testimony—"salacious and unverified." While the FISA application relied on Steele's past record of credible reporting on other unrelated matters, it ignored or concealed his anti-Trump financial and ideological motivations. Furthermore, Deputy Director McCabe testified before the Committee in December 2017 that no surveillance warrant would have been sought from the FISC without the Steele dossier information.

# UNCLASSIFIED

TOP SECRET//NOFORN

TOP SECRET//NOFORN

5) The Page FISA application also mentions information regarding fellow Trump campaign advisor George Papadopoulos, but there is no evidence of any cooperation or conspiracy between Page and Papadopoulos. The Papadopoulos information triggered the opening of an FBI counterintelligence investigation in late July 2016 by FBI agent Pete Strzok. Strzok was reassigned by the Special Counsel's Office to FBI Human Resources for improper text messages with his mistress, FBI Attorney Lisa Page (no known relation to Carter Page), where they both demonstrated a clear bias against Trump and in favor of Clinton, whom Strzok had also investigated. The Strzok/Lisa Page texts also reflect extensive discussions about the investigation, orchestrating leaks to the media, and include a meeting with Deputy Director McCabe to discuss an "insurance" policy against President Trump's election.

# UNCLASSIFIED

TOP SECRET//NOFORN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                    )
JUDICIAL WATCH, INC.,                               )
                                                    )
               Plaintiff,                  )
                                                    )
               v.                          )     Case No. 1:17-cv-00916 (CRC)
                                                    )
U.S. DEPARTMENT OF JUSTICE,                         )
                                                    )
               Defendants.                 )
———————————————————————)

**PROPOSED ORDER**

Having considered the parties' respective motions for summary judgment and all the

pleadings herein:

It is hereby ORDERED that Defendant's motion for summary judgment is denied and

Plaintiff's cross-motion for summary judgment is granted.

SO ORDERED.


Dated: _____.                    _____
                                                    CHRISTOPHER R. COOPER
                                                    U.S. District Judge