**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|   |   |   |
|---|---|---|
| | ) | |
| JUDICIAL WATCH, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-916 (CRC) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND**
**REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Judicial Watch does not challenge the FBI's withholdings pursuant to FOIA Exemptions

1, 3, 6, 7(C), 7(D), or 7(E).  Although Judicial Watch challenges the Exemption 7(A)

withholdings, no withholding was made solely on the basis of Exemption 7(A), and so the Court

can and should resolve this case without addressing that challenge.  Because every 7(A)

withholding was validly made pursuant to at least one other FOIA exemption, and Judicial

Watch does not argue otherwise, the FBI is entitled to summary judgment on the validity of all of

its withholdings.

Judicial Watch also challenges the adequacy of the FBI's search for responsive

documents in two respects.  First, it objects to the FBI's search for documents related to Orbis

Business Intelligence.  Although that objection is meritless, the FBI has now conducted the

keyword search Judicial Watch requested, using the terms "Orbis" and "Orbis Business

Intelligence."  It found no responsive records.  There should be no remaining dispute about the

adequacy of the FBI's search for such records.  Second, Judicial Watch suggests that the FBI was

wrong to search only the confidential human source (CHS) file of Christopher Steele for

documents related to him.  But as the FBI explained in its opening brief, that is where documents

related to a confidential human source would be found.  Judicial Watch now suggests that it is

seeking records from before Steele's time as a confidential human source, which might not

appear in his CHS file, but no such records are responsive here: Steele was already a confidential

human source on the opening date of this FOIA request.  Judicial Watch also suggests that it

seeks records from after Steele's time as a confidential human source.  Pursuant to a long-

standing policy, the FBI can neither confirm nor deny the existence of such records, the fact of

which is protected by Exemptions 6 and 7(C).

## ARGUMENT

**A.     Because every Exemption 7(A) withholding was also justified by another FOIA exemption that Judicial Watch does not challenge, Judicial Watch's challenge to the FBI's reliance on Exemption 7(A) must fail.**

Judicial Watch "does not challenge" the FBI's withholdings under exemptions other than

Exemption 7(A).  ECF No. 37 at 4.  That means that Judicial Watch does not challenge

withholdings under FOIA Exemptions 1, 3, 6, 7(C), 7(D), and/or 7(E).  ECF No. 33-1 at 8–15,

17–27.  But every withholding supported by Exemption 7(A) was also supported by one of these

other exemptions that Judicial Watch is decidedly not challenging.  As Michael G. Seidel makes

clear in the supplemental declaration submitted with this brief, Exemption 7(A) "was not the sole

basis for any withholding."  Seidel Decl. ¶ 25.

Judicial Watch is therefore entitled to summary judgment on all of its withholdings.

"When the Court concludes that a single exemption is sufficient to justify [a] withholding . . . , it

limits its discussion to that exemption and does not the reach the availability of the additional

exemptions invoked."  *Borda v. U.S. Dep't of Justice*, 306 F. Supp. 3d 306, 317 (D.D.C. 2018);

*see also Ctr. for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir.

2003) ("Finding the [withheld material] protected under 7(A), we need not address the other

exemptions invoked by the government and reserve judgment on whether they too would support withholding the [material].")); *Darui v. U.S. Dep't of State*, 798 F. Supp. 2d 32, 39 (D.D.C. 2011) (explaining that "the Court need not reach" the applicability of alternative exemptions once it has concluded that a withholding is valid under one exemption); *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Homeland Security*, 648 F. Supp. 2d 152, 162 (D.D.C. 2009) ("[T]he Court need not reach the question whether Exemption 5 has been properly asserted here because Exemption 7(E), which has gone unchallenged . . . , covers all of the redacted material at issue.").

> **B.     The FBI adequately searched for records related to Orbis Business Intelligence.**

In his declaration supporting the FBI's motion for summary judgment, David M. Hardy explained that although the FOIA request at issue here "referenced records of payments to Orbis Business Intelligence, [Christopher] Steele's company, and meetings or conversations with Orbis employees or representatives," it was Steele and not Orbis who was the FBI's confidential source.  2d Hardy Decl. ¶ 24 n.8.  Accordingly, "any payments were made to him and not the company, and interactions were between him and the FBI," not Orbis.  *Id.*  Moreover, "the FBI has no way to search for unnamed Orbis employees or representatives."  *Id.*  For that reason, "the FBI reasonably limited it[s] search to responsive records regarding/involving Steele."  *Id.*

Although this was more than an adequate reason to limit the search, Judicial Watch objects that "a key word search on Orbis Business Intelligence could . . . also have been done." ECF No. 37 at 3.  To narrow the dispute between the parties, and without conceding that its prior search was inadequate, the FBI performed such a search which, as the Bureau predicted, returned no responsive records.  Seidel Decl. ¶ 15.  There should no longer be any question as to the adequacy of the FBI's search for records related to Orbis Business Intelligence.

**C.     The FBI adequately searched for records related to Christopher Steele.**

Judicial Watch also challenges the FBI's decision to limit its search for records related to

Christopher Steele to his confidential human source file.  As Mr. Hardy previously explained,

"given that Steele was a confidential human source (CHS)," the FBI reasonably concluded that

records of the type requested "would be located in his CHS file because such records are

maintained by the FBI in the relevant CHS file."  2d Hardy Decl. ¶ 23.  In making this statement,

the FBI interpreted Judicial Watch's request as seeking records associated with Steele's service

as a confidential human source.  As the FBI explained in its first summary judgment brief, this

FOIA request for records of any FBI communications with or payments to Steele was submitted

eight days after the Washington Post reported claims that the FBI had agreed to pay Steele to

investigate alleged ties between Russia and individuals associated with the campaign of

President Trump.  ECF No. 9-1 at 2–3, 7–8.  The FBI reasonably interpreted Judicial Watch's

FOIA request in light of the context in which it was submitted, concluded that it was seeking

records associated with his service as a CHS, and that "there were no other locations [than his

CHS file] where additional responsive records would be maintained."  2d Hardy Decl. ¶ 24.

In its cross-motion, Judicial Watch now suggests that it is also seeking records unrelated

to Steele's time as a confidential human source—records that either pre-date or post-date that

service.  Judicial Watch argues that a search of Steele's CHS file would not have captured

"records regarding FBI's relationship with Steele from before he was signed up as an official,

'on-the-books' confidential source."  ECF No. 37 at 3.  But as Mr. Seidel explains, Steele was

already "a CHS as of January 1, 2016," the beginning of the relevant period for this FOIA

request.  Seidel Decl. ¶ 24.  Because Steele was already a confidential human source at the

beginning of this request period, there cannot be any responsive records of communications with

Steele before he became a confidential human source.

As for records of communications with Steele after he was closed as a confidential human source in 2016, Exemptions 6 and 7(C) protect his privacy interests and prevent the FBI from confirming or denying the existence of such records.  "Pursuant to long-standing policy, the FBI will not confirm or deny the existence of law enforcement records about a third party in the absence of a privacy waiver or proof of death, unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests."  Seidel Decl. ¶ 22.  "The FBI instituted this policy in order to protect the privacy rights of individuals, particularly those who appear in FBI law enforcement files."  *Id.*  Judicial Watch has established no such public interest in communications between Steele and the FBI from the period after his closure as a confidential human source.  Exemptions 6 and 7(C) therefore authorize the FBI to refuse to confirm or deny the existence of such records.

As the D.C. Circuit has "'long recognized,' the '"mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."'"  *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003), in turn quoting *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 767 (D.C. Cir. 1990)); *see Nation Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (discussing and collecting the "long line of FOIA cases holding that disclosure of the identities of private citizens mentioned in law enforcement files constitutes an unwarranted invasion of privacy and is thus exempt under 7(C)"); *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names . . . of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure.").  In "the Glomar context, the protections of Exemption 7(C) can apply even if admitting the existence of

records would not definitively link an individual to a criminal inquiry; if an '[o]fficial

acknowledgement' would 'engender comment and speculation and carr[y] a stigmatizing

connotation,' the exemption is triggered." *Cause of Action v. Treasury Inspector General for

Tax Administration*, 70 F. Supp. 3d 45, 55 (D.D.C. 2014) (quoting *Fitzgibbon*, 911 F.2d at 767).

Moreover, the FBI has not made any "official public disclosure . . . confirming or

denying whether it had any further interactions with Mr. Steele after he was terminated as a

CHS." Seidel Decl. ¶ 18. Nor has Judicial Watch plausibly alleged the existence of any such

interactions. Instead, it alleges that Steele communicated with Bruce Ohr, a Department of

Justice official, who in turn communicated with the FBI. ECF No. 37 at 3. Records of such

communications, if they existed, would not be responsive to this FOIA request, because neither

communications between Steele and Ohr nor communications about Steele between Ohr and the

FBI are communcations between Steele and the FBI, which are the communications sought here.

## CONCLUSION

For the reasons stated above and in its opening brief, the FBI is entitled to summary

judgment on the adequacy of its search and the propriety of its withholdings.


Respectfully submitted,

HASHIM M. MOOPPAN
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director
Federal Programs Branch

*/s/ James Bickford*
James Bickford
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW

Washington, DC  20530
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

Date: June 14, 2019                            *Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDICIAL WATCH, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE, <br><br> Defendant. | Case No. 17-cv-0916 (CRC) |

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)      I am currently the Assistant Section Chief ("ASC") of the Record/Information

Dissemination Section ("RIDS"), Information Management Division ("IMD") of the Federal

Bureau of Investigation ("FBI") in Winchester, Virginia and in the absence of RIDS Section

Chief, David M. Hardy, I serve as Acting Section Chief for RIDS.    Before I held this position, I

was the Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an

Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act

("FOIA") Litigation Unit from September 2011 to November 2012.    In those capacities, I had

management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("PA")

litigation cases nationwide.    Prior to my joining the FBI, I served as a Senior Attorney at the

U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011,

where among myriad legal responsibilities, I advised on FOIA/PA matters and served as agency

counsel representing the DEA in FOIA/PA lawsuits nationwide.    I also served as a U.S. Army

Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006,

culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation

Division where I oversaw FOIA/PA litigation for the U.S. Army.   I am an attorney registered in

the State of Ohio and the District of Columbia.

(2)     In my official capacity as Acting Section Chief of RIDS, I supervise

approximately 244 employees who staff a total of twelve (12) Federal Bureau of Investigation

Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective

mission is to effectively plan, develop, direct, and manage responses to requests for access to

FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of

2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526;

Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and

Presidential and Congressional directives.   My responsibilities also include the review of FBI

information for classification purposes as mandated by E.O. 13526, 75 Fed. Reg. 707 (2010), and

the preparation of declarations in support of Exemption (b)(1) claims under the FOIA.   I have

been designated by the Attorney General of the United States as an original classification

authority, and a declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to requests for information from its files pursuant to the provisions of

the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.   Specifically, I am

2

aware of the FBI's handling of Plaintiff's FOIA request for certain records concerning
Christopher Steele, a former confidential intelligence source for the FBI.

(4)     This declaration is being submitted in support of DOJ's renewed motion for
summary judgment and in opposition to Plaintiff's cross-motion for summary judgment.   It
supplements ECF No. 34, Second Declaration of David M. Hardy (hereafter "Second Hardy
Declaration").

\* \* \*

## ORBIS BUSINESS INTELLIGENCE SEARCH

(5)     In Plaintiff's Memorandum of Points and Authorities in Opposition to
Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for
Summary Judgment (hereafter "Plaintiff's MPA"), it objected to the FBI's decision to not
separately search using the name of Mr. Steele's business – Orbis Business Intelligence –
claiming that Defendant offered "no reason why a key word search on Orbis Business
Intelligence could not have also been done."   *See* ECF No. 37, Plaintiff's MPA, at 3.

(6)     The FBI explained in footnote 8 of the Second Hardy Declaration that Mr. Steele
was the FBI's confidential human source ("CHS"), not his company, so any payments would
have been made to him and not the company, and interactions would have been between him and
the FBI rather than an unnamed representative of his company.   Accordingly, the FBI
concluded that a search using the name of his company was not reasonably calculated to locate
responsive records, not that it "could not" conduct such a search.   While the FBI does not
concede that a search for Orbis Business Intelligence was required in order for the FBI's search
to be reasonable, it has now conducted a search of its Central Records System for the terms

3

"Orbis" and "Orbis Business Intelligence."   That search is described further below.   It located

no responsive records.[1]

## BACKGROUND ON THE FBI'S CENTRAL RECORDS SYSTEM

(7)   The Central Records System ("CRS") is an extensive system of records consisting

of applicant, investigative, intelligence, personnel, administrative, and general files compiled and

maintained by the FBI in the course of fulfilling its integrated missions and functions as a law

enforcement, counterterrorism, and intelligence agency to include performance of administrative

and personnel functions.   The CRS spans the entire FBI organization and encompasses the

records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices

("Legats") worldwide.

(8)   The CRS consists of a numerical sequence of files, called FBI "classifications,"

which are organized according to designated subject categories.   The broad array of CRS file

classification categories include type of criminal conduct and investigations conducted by the

FBI, as well as categorical subjects pertaining to counterterrorism, intelligence,

counterintelligence, personnel, and administrative matters.   For identification and retrieval

purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number

("UCFN") consisting of three sequential components:   (a) the CRS file classification number;

(b) the abbreviation of the FBI Office of Origin ("OO") initiating the file; and (c) the assigned

individual case file number for that particular subject matter.[2]   Within each case file, pertinent

---

[1]   The FBI did not conduct a supplemental search of its CHS system for Orbis Business Intelligence
because Mr. Steele, and not his company, was the FBI's CHS.

[2]   For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file
classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case
specific file number.

documents of interest are "serialized," or assigned a document number in the order which the
document is added to the file, typically in chronological order.

### The CRS General Indices and Indexing

(9)     The general indices to the CRS are the index or "key" to locating records within
the enormous amount of information contained in the CRS.   The CRS is indexed in a manner
which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably
and adequately locate pertinent files in the performance of their law enforcement duties.   The
general indices are arranged in alphabetical order and comprise an index on a variety of subject
matters to include individuals, organizations, events, or other subjects of investigative interest
that are indexed for future retrieval.   The entries in the general indices fall into two category
types:

    a.   <u>Main entry</u>.   This entry pertains to records indexed to the main subject(s) of a
file, known as "main file" records.   The "main" entry carries the name of an
individual, organization, or other subject matter that is the designated subject
of the file.

    b.   <u>Reference entry</u>.   This entry, or a "cross-reference," pertains to records that
merely mention or reference an individual, organization, or other subject
matter that is contained in a "main" file record about a different subject
matter.

(10)     FBI Special Agents ("SA") and/or designated support personnel may index
information in the CRS by individual (persons), by organization (organizational entities, places,
and things), and by event (*e.g.,* a terrorist attack or bank robbery).   Indexing information in the
CRS is based on operational necessity, and the FBI only indexes that information considered
relevant and necessary for future retrieval.   Accordingly, the FBI does not index every
individual name or other subject matter in the general indices.

*Automated Case Support*

(11)    Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995.   As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.   ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[3]

(12)    The Universal Index ("UNI") was the automated index of the CRS and provided all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching.   Individual names were recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event.   Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS.   As such, a UNI index search in ACS was capable of locating FBI records well before its 1995 FBI-wide implementation until the system was decommissioned on August 1, 2018, in both paper and electronic format.[4]

---

[3] ACS was and the next generation Sentinel system is relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[4] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices."   Since the date range of the requested records in this case was significantly after 1995, a manual indices search was not warranted.

6

### *Sentinel*

(13)    Sentinel is the FBI's next generation case management system that became

effective FBI-wide on July 1, 2012.    Sentinel provides a web-based interface to FBI users, and

it includes the same automated application that was utilized in ACS.    After July 1, 2012, all FBI

generated records are created electronically in case files via Sentinel; however, Sentinel did not

replace ACS and its relevance as an important FBI search mechanism.    Just as pertinent

information was indexed into UNI for records generated in ACS before July 1, 2012, when a

record is generated in Sentinel, information is indexed for future retrieval.    Moreover, there was

an index data sharing nexus between the Sentinel and ACS systems whereby information

indexed into Sentinel was replicated or "backfilled" into ACS.    In sum, the Sentinel case

management system built on ACS and shared its operational purpose; Sentinel provided another

portal to locate information within the vast CRS for FBI records generated on or after July 1,

2012.    At the time of Plaintiffs' request, CRS automated indices, available within Sentinel and

the UNI application of ACS, in most cases, represented the most reasonable means for the FBI to

locate potentially responsive records to FOIPA requests prior to August 1, 2018.[5]    This is

because these automated indices offered access to a comprehensive, agency-wide set of indexed

data on a wide variety of investigative and administrative subjects.    Currently, the FBI's

automated indices consist of millions of searchable records and are updated daily with newly

indexed material.

---

[5] On August 1, 2018, the ACS case management system was decommissioned and ACS data was migrated into Sentinel including the ACS indices data and digitized investigative records formerly available in ACS. Moreover, Sentinel retains the index search methodology and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries in case files.   All CRS index data from the UNI application previously searched via ACS is now searched through the "ACS Search" function within Sentinel.

### THE FBI'S SEARCH OF SENTINEL

(14)    To locate responsive records in the CRS, the FBI employs an index search

methodology.    Index searches of the CRS are reasonably expected to locate responsive material

within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate

retrieval based on operational necessity.    Because Plaintiff's request sought records generated

on or after July 1, 2012, the FBI relied on Sentinel to conduct its index search in this case.

(15)    The FBI searched Sentinel using the terms "Orbis Business Intelligence" and

"Orbis."    The FBI located no records responsive to Plaintiff's FOIA request as a result of this

search.

\* \* \*

### CHRISTOPHER STEELE SEARCHES OUTSIDE THE CHS SYSTEM

(16)    In Plaintiff's MPA, it argued that the FBI's "search was not sufficiently broad to

locate records regarding FBI's relationship with Steele from before he was signed up as an

official, 'on-the-books' confidential source" and assumed that there must be a variety of

communications with him prior to him being "formally retained as a CHS."    ECF No. 37,

Plaintiff's MPA, at 3.    Plaintiff has provided no factual support for its assumption that the FBI

had any such communications with Mr. Steele prior to him becoming a confidential human

source ("CHS") for the FBI or, if so, that any such communications would have occurred after

January 1, 2016, which is the beginning date for responsive records specified in Plaintiff's FOIA

request.    In fact, Mr. Steele was a CHS as of January 1, 2016, and so Plaintiff's claim in this

regard is without merit.

(17)    Plaintiff also claims that it "has been publicly acknowledged that Steele continued

8

to provide information to the FBI via Bruce Ohr even after his deactivation" and thus a search of

the CHS system for the period of November 2016 to May 17, 2017 (which was the search cut-off

date for plaintiff's request) was not sufficient.   *See* ECF No. 37, Plaintiff's MPA, at 3.   In

support of this claim, Plaintiff cites the Nunes Memo.   *Id.*   The problem for Plaintiff, however,

is that its request is for records of communications between Mr. Steele and "any official,

employee, or representative of the FBI."   Even assuming the truth of the claim that Mr. Steele

and Mr. Ohr remained in contact after November 2016, Mr. Ohr was not and is not an "official,

employee, or representative of the FBI."   There has been no official public disclosure by the

FBI confirming or denying whether the FBI had any further interactions with Mr. Steele

following his termination as a CHS in November 2016, which is what Plaintiff's request would

cover.

(18)    Since there has been no official public disclosure by the FBI confirming or

denying whether it had any further interactions with Mr. Steele after he was terminated as a CHS

and since the official public disclosures about the FBI's interactions with Mr. Steele concerned

him being a CHS for the FBI, the FBI properly limited its search to the CHS system.

(19)    The FBI cannot confirm or deny the existence of records that would be within the

scope of Plaintiff's request following his termination as a CHS without infringing his privacy

interests.   Accordingly, with respect to Plaintiff's claim that searches for records about Mr.

Steele outside of the CHS system should have been conducted, the FBI relies on a Glomar

response based on FOIA Exemptions (b)(6) and (b)(7)(C).   While Mr. Steele's being a CHS to

the FBI in relation to the investigation into Russian interference in the 2016 Presidential election

specifically has been publicly acknowledged and thus cannot be protected under the FOIA's

privacy protections, he – like other third parties – retains privacy interests in relation to any non-disclosed, non-public information connecting him to the FBI.

### EXEMPTIONS (b)(6) AND (b)(7)(C)

(20)     Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).   All information that applies to a particular person falls within the scope of Exemption (b)(6).   Exemption (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

(21)     The FBI asserts Exemption (b)(6) in conjunction with Exemption (b)(7)(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.   The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions.

(22)     Pursuant to long-standing policy, the FBI will not confirm or deny the existence of law enforcement records about a third party in the absence of a privacy waiver or proof of death, unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests.   The FBI instituted this policy in order to protect the privacy rights of individuals, particularly those who appear in FBI law enforcement files.   It is well-recognized that individuals have substantial privacy interests in relation to being associated with law

enforcement investigations because any such association can engender comment, speculation, or harassment; can be embarrassing and stigmatizing; and can, in some circumstances, result in physical harm or threats of harm or death.

(23)    If a requester establishes a public interest, then the FBI will balance that public interest against the third party's privacy interests.   This balancing is done on a case-by-case basis.   The FBI will process a request for and release non-exempt law enforcement records about a third party only if it determines that the public interest outweighs the individual's privacy interests after conducting the balancing analysis.   The balancing analysis in each case is necessarily fact-specific.   Thus, each request must be treated individually, and the FBI must retain flexibility in the way in which it handles each request.

(24)    Here, Plaintiff's only claim is that is has been publicly acknowledged that Steele continued to provide information to the FBI via Mr. Ohr.   As noted above, that does not actually help Plaintiff with respect to the specific information at issue in its request.   Other than that, Plaintiff has not shown why there is an overriding public interest in records within the scope of its request, if they exist.

* * *

## FOIA EXEMPTION (b)(7)(A)

(25)    Finally, in the Second Hardy Declaration, the FBI described certain withholdings that were justified by FOIA Exemption (b)(7)(A).   Although the FBI invoked Exemption (b)(7)(A) to justify certain withholdings, it was not the sole basis for any withholding.   Every withholding justified by Exemption (b)(7)(A) was also justified by at least one other exemption described in the Second Hardy Declaration.

11

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this __14th__ day of June 2019.

MICHAEL G. SEIDEL
Acting Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

12