**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JUDICIAL WATCH, INC.**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. DEPARTMENT OF JUSTICE**, <br><br> Defendant. | Case No. 17-cv-0916 (CRC) |

## MEMORANDUM OPINION

In March 2017, Plaintiff Judicial Watch, Inc. submitted a Freedom of Information Act ("FOIA") request to the Federal Bureau of Investigation ("FBI"), a component of Defendant Department of Justice ("DOJ"), regarding the FBI's relationship with former British intelligence operative Christopher Steele. When the FBI provided a *Glomar* response stating that it could "neither confirm nor deny the existence of records responsive to [Judicial Watch's] request," see Declaration of David M. Hardy ("First Hardy Decl."), Ex. C, ECF No. 10-3, Judicial Watch filed suit, see Complaint, ECF No. 1. An initial round of summary judgment briefing followed, focused on whether the FBI's *Glomar* response was proper. See Mot. for Summ. J., ECF No. 9; Cross Mot. for Summ. J., ECF No. 13. In February 2018, the Court held that it was and granted DOJ's motion. See Order, ECF No. 18.

Less than a month later, Steele's relationship with the FBI was declassified—meaning that records the Bureau had refused to confirm or deny even existed were made public. Shortly thereafter, Judicial Watch asked the Court to reconsider its February 2018 order, see Pl's Mot. for Reconsideration, ECF No. 20, the FBI withdrew its *Glomar* response, see Response re Mot. for Reconsideration, ECF No. 21, and the Court vacated its prior order granting summary judgment to the government, see Minute Order of March 26, 2018.

The FBI has since conducted a search for records responsive to Judicial Watch's request, and now seeks summary judgment for a second time.  See Def's Mot. for Summ. J., ECF No. 33.  Judicial Watch opposes the Bureau's motion and seeks summary judgment in its favor.  See Pl's Cross Mot. for Summ. J., ECF No. 38.  Although Judicial Watch initially questioned both the adequacy of the Bureau's search and the propriety of its withholdings, developments during the briefing of the competing motions have winnowed the parties' dispute down to a single issue: whether the FBI should have searched for records post-dating Steele's service as an FBI confidential source.  On that score, and for the reasons that follow, the Court agrees with Judicial Watch and will grant its cross-motion for summary judgment.

## I. Background[1]

As reported extensively by the media, during the 2016 election former British intelligence operative Christopher Steele compiled a 35-page dossier on then-candidate Donald Trump.  The dossier allegedly included "allegations that the government of Russia possesses compromising personal and financial information about President Trump."  Id.  The question of who commissioned and paid for the Trump Dossier was a subject of much contention in media and political circles.

On February 28, 2017, the *Washington Post* reported that the FBI had once intended to pay Steele to continue looking into ties between then-candidate Trump and the Russian government.[2]  The story concluded that the FBI did not pay Steele and noted that the FBI

---

[1] The first portion of this background, detailing the genesis of the FOIA request through the first round of summary judgment, is taken from the Court's prior opinion in this case.  See Memorandum Opinion, ECF No. 19.

[2] See Tom Hamburger & Rosalind S. Helderman, *FBI Once Planned to Pay Former British Spy who Authored Controversial Trump Dossier*, Wash. Post (Feb. 28, 2017),

declined to comment on the report.  Eight days later, on March 8, 2017, Judicial Watch lodged a FOIA request with the FBI seeking three categories of documents related to the *Post* story:

1. Any and all records of communication between any official, employee, or representative of the FBI and Steele.

2. Any and all records regarding, concerning, or related to the proposed, planned, or actual payment of any funds to Steele and/or his company Orbis Business Intelligence.

3. Any and all records produced in preparation for, during, or pursuant to any meetings or telephonic conversations between any official, employee, or representative of the FBI and Steele and/or any employee or representative of his company Orbis Business Intelligence.

First Hardy Decl. Ex. A, at 1.

As discussed in the beginning of this opinion, when the FBI failed to respond to this request in a timely fashion, Judicial Watch filed suit under FOIA against the Department of Justice.  See Compl. ¶¶ 7, 11.  That same day, on May 16, 2017, the FBI issued a letter that asserted a *Glomar* response to Judicial Watch's request, refusing to confirm or deny the existence of any responsive documents on the basis of six separate FOIA exemptions.  First Hardy Decl. Ex. C, at 1.  After an initial round of summary judgment briefing concerning the legitimacy of that *Glomar* response, the Court sided with the government.  See Order, ECF No. 18.

Once Steele's relationship with the FBI was declassified, however, the Bureau withdrew its *Glomar* response, see Response re Mot. for Reconsideration, and the Court vacated its prior order granting summary judgment to the government, see Minute Order of March 26, 2018.  The

---

https://www.washingtonpost.com/politics/fbi-once-planned-to-pay-former-british-spy-who-authored-controversial-trump-dossier/2017/02/28/896ab470-facc-11e6-9845-576c69081518_story.html?utm_term=.db8d68d38f3c.

FBI followed up with a search for records responsive to Judicial Watch's three requests. It searched Steele's confidential human source ("CHS") file and made two productions of responsive, non-exempt records, releasing five pages in full and another 85 in part. Second Declaration of David M. Hardy ("Second Hardy Decl."), ECF No. 34, ¶¶ 12, 22–24, 29. For the partial redactions—and the 14 documents it withheld in full—the Bureau claimed cover under FOIA Exemptions 1, 3, 6, 7(A), 7(C), 7(D), and 7(E). See generally Second Hardy Decl.; see also 5 U.S.C. § 552(b)(1)–(7).

When briefing began in this latest round of summary judgment briefing, Judicial Watch found three faults with DOJ's search and another two with its withholdings. See Pl's Mem. Pts. and Auth. in Opp. to Def's Mot. Summ. J. and in Supp. of Pl's Cross-Mot. for Summ. J. ("Pl's Opp."), ECF No. 37, at 2–3. After DOJ conducted a supplemental search (though without admitting any legal obligation to do so) and highlighted its alternative bases for withholding certain records, Judicial Watch concedes that just "[o]ne issue remains"—whether DOJ improperly failed to search for "records of communications with Steele after he was closed as a confidential source in November 2016." Pl's Reply in Supp. of Pl's Mot. Summ. J. ("Pl's Reply"), ECF No. 41, at 1. That question is now ripe for the Court's resolution.

## II. Legal Standard

FOIA cases are typically resolved on summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Judicial Watch's lone challenge is to the adequacy of the Bureau's search. When faced with such a challenge, the agency must demonstrate "beyond material doubt that its search was

reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal quotation marks omitted) (quoting Valencia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999)).  The adequacy of a search depends on the reasonableness of its methods, not the quantity or quality of documents it reveals.  See CREW v. U.S. Gen. Servs. Admin., No. 18-cv-377, 2018 WL 6605862, at *2–3 (D.D.C. Dec. 17, 2018).  An agency must show that it made "a good faith effort to conduct a search for requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  That showing can be made through declarations that detail "what records were searched, by whom, and through what process." Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994).  Agency declarations are "accorded a presumption of good faith" and "cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted).

The Bureau defends its decision not to search for communications with Steele after he ceased being a confidential source by, among other things, claiming that any additional records would be protected by two FOIA exemptions.  Agencies bear the burden of justifying any withholdings it has made pursuant to a FOIA exemption.  See, e.g., Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009).  An agency may justify its withholdings through sufficiently detailed declarations, see, e.g., id., which will often be paired with so-called Vaughn indices that describe a withheld document and the reason the agency believes it qualified for a particular exemption, Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).  However, because the primary

purpose of FOIA is disclosure, courts construe exemptions narrowly.  See, e.g., DiBacco v. U.S. Army, 795 F.3d 178, 183 (D.C. Cir. 2015).

### III. Analysis

Judicial Watch contends that the FBI conducted an insufficient search because it failed to capture records post-November 2016, *after* Steele was no longer serving as a confidential source. Pl's Reply at 1.  The Bureau responds that, whatever records it may have regarding Steele after his service as a confidential source ended, those records would be protected from disclosure by Exemptions 6 and 7(C).  See Def's Opp. to Pl's Cross-Mot. for Summ. J and Reply in Supp. of Mot. for Summ. J. ("Def's Reply"), ECF No. 40, at 5.  The Court will say a bit about each exemption before examining their applicability to the records Judicial Watch seeks.

Exemption 6 shields from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "The catchall provision 'similar files' includes any '[g]overnment records on an individual which can be identified as applying to that individual.'"  Prechtel v. FCC, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (quoting U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982)).  If the withheld information qualifies as "personnel and medical files and similar files," it is covered by Exemption 6 so long as the "privacy interest in non-disclosure" is greater than "the public interest in the release of the records."  Lepelletier v. FDIC, 164 F.3d 37, 46 (D.C. Cir. 1999).  But the "presumption in favor of disclosure [under Exemption 6] is as strong as can be found anywhere in the [FOIA]."  Wash. Post Co. v. HHS, 690 F.2d 252, 261 (D.C. Cir. 1982).

Exemption 7(C) likewise protects from disclosure information "compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion

of privacy." 5 U.S.C. § 552(b)(7)(C). Information is "compiled for law enforcement purposes" if it was gathered "to determine whether there was 'an identifiable possible violation of law.'" Butler v. U.S. Dep't of Labor, 316 F. Supp. 3d 330, 336 (D.D.C. 2018) (quoting Birch v. U.S. Postal Serv., 803 F.2d 1206, 1210 (D.C. Cir. 1986)). If the information so qualifies, the question, as with Exemption 6, becomes whether the individual's personal privacy interests outweigh the public interest in disclosure. See Weisberg, 745 F.2d at 1491. If it does, Exemption 7(C) may properly be invoked. When an agency invokes both Exemptions 6 and 7(C), courts "focus" on Exemption 7(C) because it "establishes a lower bar for withholding material." Citizens for Responsibility & Ethics in Washington v. Dep't of Justice, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) (internal quotation marks omitted).

Here, the FBI's declarant explains that "[p]ursuant to long-standing policy, the FBI will not confirm or deny the existence of law enforcement records about a third party in the absence of a privacy waiver or proof of death, unless the requester establishes a public interest in disclosure that outweighs the third party's privacy interests." Declaration of Michael G. Seidel ("Seidel Decl."), ECF No. 39-1, ¶ 22. He further explains that, because Judicial Watch failed to identify "an overriding public interest in records within the scope of its request," the Bureau can claim the protection of both Exemptions 6 and 7(C). Id. ¶ 24. Judicial Watch, meanwhile, both minimizes Steele's privacy interests—"[n]o typical privacy interest exists such as [a] person's medical history or the identify of a police informant"—and insists that the public interest in such records "is manifest." Pl's Reply at 1–2. Because Steele authored the "Trump dossier" that purportedly played a part in launching the Russia investigation, Judicial Watch says he "is a central figure in one of the most important public matters of recent years." Id.

Key to resolving this dispute is a proper understanding of "public interest" in the FOIA context. "The 'public interest' in this context must relate to FOIA's 'core purpose' of 'shedding light on an agency's performance of its statutory duties.'" Prechtel v. FCC, 330 F. Supp. 3d 320, 330 (D.D.C. 2018) (quoting DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773–75 (1989)) (alteration and citation omitted); see also Consumers' Checkbook Ctr. for Study of Servs. v. U.S. Dep't of Health & Human Servs., 554 F.3d 1046, 1051 (D.C. Cir. 2009) ("[I]nformation about private citizens that reveals little or nothing about an agency's own conduct does not serve a relevant public interest under FOIA." (punctuation and citation omitted)). Thus, while there is little doubt that certain segments of the American public are *interested* in Steele and his relationship with the FBI, the legally relevant question is whether communications between them after his time as a CHS would still "shed[ ] light on [the FBI's] performance of its statutory duties." Prechtel, 330 F. Supp. 3d at 330 (internal quotation marks omitted).

Although it is difficult for the Court to opine on that question in the abstract—given that the FBI has not conducted the search and the contents of any potentially responsive records are unknown—the Court can envision how such records might reveal insights into the FBI. Judicial Watch, for its part, appears to believe that the public interest is self-evident. See Reply at 2 ("The FOIA request at issue[ ] seeks communications between the FBI and a foreign national who was paid to author a document of [sic] concerning the President of the United States and Russia."). But that does not do much to clarify how communications between Steele and the FBI after Steele's service as a CHS concluded would shed light on the FBI's performance of its duties. Even so, the potential for illuminating the FBI's activities is not too difficult to discern. Communications post-dating Steele's time as an informant might reveal a great deal about why

the FBI developed him as a CHS, his performance as a CHS, and why the FBI opted to terminate its relationship with him. Those records might either bolster or weaken Steele's credibility as a source. That information, in turn, could provide a basis on which to evaluate the FBI's performance of its law-enforcement duties, including its judgment in selecting and relying on confidential sources, especially in connection with such a politically sensitive subject. Of course, the records Judicial Watch speculates about might not even exist—and even if they do, they may not reveal anything significant about the FBI's operations. But that they might do so makes them a matter of potential public interest.

Does that legitimate public interest outweigh Steele's privacy interest? Given the unique circumstances presented by this case, the answer may well be yes. As an initial matter, the Court notes that Steele is not presently unknown to the world—or anywhere close to it. He has already been thrust into the spotlight because of his relationship with the FBI. It is hard for the Court to imagine that the disclosure of any communications between him and the FBI post-dating his time as a CHS—assuming such records exist—would occasion much greater public scrutiny than he has already endured. For that reason, Steele's privacy interests are far different from those courts usually consider under Exemption 7(C), where disclosure would make public for the first time an individual's affiliation with law enforcement, whether as agent, cooperator, or target. See Bast v. U.S. Dep't of Justice, 665 F.2d 1251, 1254 (D.C. Cir. 1981) (stating that Exemption 7(C) "affords broad[ ] privacy rights to suspects, witnesses, and investigators" because of "the stigma potentially associated with law enforcement investigations"); Davis v. FBI, No. 18-cv-0086, 2019 WL 2870729, at *7–8 (D.D.C. July 3, 2019) (Cooper, J.) (upholding Exemption 7(C) withholdings by FBI and Secret Service where disclosure would publicly identify investigating agents and third parties who assisted the investigation). That Steele is already a public figure

with a well-known association with the FBI does not, to be sure, destroy his privacy interest in other communications he may have had with the FBI. If, for example, those records reveal that Steele was suspected of some wrongdoing, it stands to reason he might suffer some new, additional reputational harm. See SafeCard Servs., Inc., 926 F.2d at 1205 ("There is little question that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarrassment and potentially more serious reputational harm." (internal quotation marks omitted)). Just the same, Steele's FBI-related notoriety certainly weakens his privacy interests.

The balance therefore tilts in favor of disclosure. Accordingly, the Court will order the FBI to conduct a search for records post-dating Steele's service as a confidential source. If that search turns up responsive records, the Court will permit the Bureau to renew its argument that specific portions of those records would reveal particularly private information about Steele and thus should be exempt from disclosure under 7(C). It may also become clear that any potentially responsive records do not shed light on the FBI's performance of its duties, which would also justify invoking 7(C). Finally, even assuming that the records are a matter of public interest, the Bureau might invoke other potentially applicable exemptions, including Exemption 7(E), which permits an agency to withhold "information compiled for law enforcement purposes" if producing it "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). But until the FBI actually conducts the search, it cannot explain, and the Court cannot evaluate, the propriety of those exemptions.

## IV. Conclusion

For the foregoing reasons, the Court will deny the government's motion for summary judgment and will grant Judicial Watch's cross-motion for summary judgment. The government shall complete the supplemental search described herein by 60 days from the date of this writing and shall provide by that same date a status report describing the results of the search and a plan for processing any records. A separate Order accompanies this Memorandum Opinion.

_____  
CHRISTOPHER R. COOPER  
United States District Judge

Date: <u>August 16, 2019</u>